Ronald **BRADBURY**,
Petitioner-Appellant,

v.

Louie L. **WAINWRIGHT**,
Respondent-Appellee.

No. 82–5693.

United States Court of Appeals,
Eleventh Circuit.

Nov. 7, 1983.

Richard A. Belz, Fla. Instit. Legal Services, Inc., Gainesville, Fla., for petitioner-appellant.

Gerald B. Curington, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before KRAVITCH, HENDERSON and ANDERSON, Circuit Judges.

---

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Ronald Bradbury, an inmate in the Union Correctional Institution of the Florida prison system, challenges the constitutionality of Rule 33–3.13, a regulation promulgated by appellee Louie L. Wainwright and the Florida Department of Corrections. Rule 33.3–13 regulates inmate marriages. The Rule provides in pertinent part:

(1) The following inmates are not permitted to marry:

(a) Inmates under sentence of death.

(b) Inmates under sentence of life imprisonment and required to serve no less than twenty-five (25) years before becoming eligible for parole, except they may marry if they become eligible under sub-section (2)(c).

(c) Inmates to prisoners as defined in § 944.02(5), Fla.Stat.

(2) Marriage of other inmates is permitted for inmates meeting one of the criteria below:

(a) In the event of a current pregnancy where both the inmate and the proposed spouse acknowledge they are the expected parents of a child.

(b) To legitimatize a child already born.

(c) If the inmate's release date can be determined definitely to be within one (1) year and the inmate is a participant in the community release and furlough program.

Rule 33.3–13,[1] Record on Appeal at 44. During his incarceration, Bradbury has been visited by Vivian Sapp, a non-inmate, and they agreed to marry. Bradbury requested the Department of Corrections to grant permission for him to marry Sapp. Pursuant to Rule 33.3–13, the Department denied Bradbury's request. Bradbury filed this action based on 42 U.S.C.A. § 1983 (West 1981) seeking a declaratory judgment and injunctive relief. Reviewing cross-motions for partial summary judgment, the district court entered summary judgment for defendant-appellee Wainwright. In this appeal, Bradbury argues that Rule 33.3–13 deprives him of rights guaranteed by the First Amendment and the Fourteenth Amendment's due process clause. After reviewing the record, we have concluded that summary judgment was inappropriate. Thus, we reverse the district court's judgment, 538 F.Supp. 377, and remand for further proceedings in light of this opinion.

At the outset, we consider Bradbury's attempt to denigrate Rule 33–3.13 as an administrative regulation unauthorized by the Florida state legislature. Bradbury claims that the Department of Corrections should not be able to prohibit the marriage in the absence of a specific grant of statutory authority enabling the Department of Corrections to promulgate such a rule. This argument is untenable, however, because the First District Court of Appeal of Florida has already held that the Department of Corrections had statutory authority

.1. The Rule prohibits marriages in two ways. In addition to the express prohibition of certain marriages in § 1, § 2 delineates three limited situations in which marriage is permitted; of course, failure to satisfy at least one of these criteria means that an inmate marriage is prohibited.

Bradbury may well fall within the express prohibition in § 1(b), since he is serving a life sentence. However, this is not absolutely clear, since § 1(b) applies to an inmate required to serve 25 years before parole eligibility, and the record before us is silent as to Bradbury's parole eligibility. The record indicates only that the Department of Corrections has stated that Bradbury does not qualify for marriage under the Rule.

On remand, the parties and the district court may consider what effect Fla.Stat.Ann. § 944.-

30 (West Supp.1982) has on this case. Even though Bradbury was sentenced to life imprisonment, his sentence can be commuted to a term for years under Fla.Stat.Ann. § 944.30 (West Supp.1982). In fact, § 944.30 requires the Department of Corrections to recommend commutation if a life prisoner has served ten years, has not sustained any misconduct charge, and has a good institutional record. Bradbury was sentenced on March 2, 1971. Thus, it is possible that the Department would release Bradbury, thereby enabling him to marry. Bradbury's right to marry is not suspended by Fla.Stat.Ann. § 944.292 (suspension of civil rights upon conviction of a felony). *See Holden v. Department of Corrections,* 400 So.2d 142, 143 (Fla.Dist.Ct.App.1981).

to promulgate Rule 33–3.13. *Department of Corrections v. Roseman,* 390 So.2d 394, 397 (Fla.Dist.Ct.App.1980), *petition for rev. denied sub nom., Holden v. Florida Department of Corrections,* 397 So.2d 778 (Fla. 1981). The *Roseman* opinion relies on Fla. Stat.Ann. § 20.315 (West Supp.1982) (creation of the Department of Corrections) and Fla.Stat.Ann. § 944.09 (West Supp.1982) (supervision of offenders; rules and regulations). 390 So.2d at 397. In the absence of any persuasive indication that the state supreme court would hold otherwise, intermediate state appellate court decisions, such as *Roseman,* must be taken to reflect a valid interpretation of state law. *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 945 (11th Cir.1982); *Allen v. A.G. Edwards & Sons, Inc.,* 606 F.2d 84, 87 (5th Cir.1979).[2] Our reliance upon the *Roseman* decision is buttressed by the fact that the Florida Supreme Court declined an opportunity to review the *Roseman* decision. *See West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940) (an intermediate state appellate court's judgment "is a datum for ascertaining state law ... the more so where, as in this case, the highest court has refused to review the lower court's decision in one phase of the litigation which is now prosecuted by the same parties before the federal court"). Hence, we will not draw any constitutionally significant distinction from the fact that Rule 33–3.13 is an administrative regulation rather than a legislative enactment.

The parties also dispute the nature of the right to marry. In evaluating their arguments, it is important to note the precise nature of Bradbury's request for permission to marry. Bradbury, according to his attorney, is willing to forego any claim to the usual incidents of marriage—cohabitation, sexual intercourse, procreation, and child-rearing. All Bradbury seeks is permission to marry Vivian Sapp in a simple ceremony officiated by a notary public. Thus, Brad-

bury relies upon "the fundamental character of the right to marry," *Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978), insofar as it relates to his decision to enter into the marital relationship. "[A]n individual's 'freedom of personal choice in matters of marriage and family life' " is "central" among due process liberties. *City of Akron v. Akron Center for Reproductive Health, Inc.,* —— U.S. ——, ——, 103 S.Ct. 2481, 2490, 76 L.Ed.2d 687 (1983) (quoting *Roe v. Wade,* 410 U.S. 113, 169, 93 S.Ct. 705, 735, 35 L.Ed.2d 147 (1973) (Stewart, J., concurring)). This freedom of choice extends to an individual's personal decision to enter into a marital relationship. *Zablocki v. Redhail,* 434 U.S. at 384–86, 98 S.Ct. at 680–81; *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). But, of course, the right to marry is not unfettered. Marriage and domestic relations have been regarded "as a virtually exclusive province of the States." *Sosna v. Iowa,* 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975). In addition to regulating the procedures, duties, and rights stemming from marriage, state regulations have absolutely prohibited certain marriages, such as result by incest, bigamy, or homosexuality. *See Zablocki v. Redhail,* 434 U.S. at 399, 98 S.Ct. at 688 (Powell, J., concurring).

Bradbury's request to marry must be considered in the special context in which it arises—the prison system. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) (quoting *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). Yet, "prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S.

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at

1209. *Cf. Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982) (adopting as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit).

520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). In the setting of a prison, there must be "mutual accomodation" between the penal institution's legitimate needs and goals and the prisoner's retained constitutional rights. *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1877; *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2975. In short, "a prisoner loses only those rights that must be sacrificed to serve legitimate penological needs." *United States v. Lilly,* 576 F.2d 1240, 1244 (5th Cir.1978); *see Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

Neither the Supreme Court[3] nor this circuit has developed a specific standard of review for prison regulations governing inmate marriages.[4] After reviewing related cases, we have concluded that there are two major Supreme Court decisions which suggest the appropriate standard for this case. The first is *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), which considered the constitutionality of prison regulations relating to censorship of prisoner mail. *Martinez* set out a two-part test. First, the prison regulation must further "an important or substantial governmental interest." *Id.* 416 U.S. at 413, 94 S.Ct. at 1811. Second, the regulation's restrictions "must be no greater than necessary or essential to the protection of the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811. Applying this

---

**3.** *See In re Goalen,* 30 Utah 2d 27, 512 P.2d 1028 (1973), *cert. denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974) (Stewart, J., dissenting) ("The extent to which this right [to marry] may be diluted for one in prison is something the Court has never decided").

**4.** The issue of a prisoner's right to marry has been raised previously. For instance, the Sixth Circuit has upheld an unwritten policy of the Ohio Department of Rehabilitation and Corrections which prohibited prisoner marriages. *Hudson v. Rhodes,* 579 F.2d 46, 46 (6th Cir. 1978), *cert. denied,* 440 U.S. 919, 99 S.Ct. 1241, 59 L.Ed.2d 470 (1979). The opinion relied on *Johnson v. Rockefeller,* 365 F.Supp. 377 (S.D.N.Y.1973), *aff'd sub nom. Butler v. Wilson,* 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974). A three-judge panel in *Johnson v. Rockefeller* sustained a New York statute which prohibited life-term inmates from marrying. 365 F.Supp. at 381. Although *Johnson v. Rockefeller* and the summary affirmance thereof receives our due consideration, it is not binding precedent. A summary affirmance has precedential value subject to these limitations. First, "a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Second, the precedential weight of a summary affirmance "extend[s] only to 'the precise issues presented and necessarily decided.'" *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 499, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800 (1981) (quoting *Mandel v. Bradley,* 432 U.S. at 176, 97 S.Ct. at 2240). Third, "an unexplicated summary affirmance . . . is not to be read as a renunciation by this court of doctrines previously announced in our opinions after full argument." *Mandel v. Bradley,* 432 U.S. at 176, 97 S.Ct. at 2240 (quoting *Fusari v. Steinberg,* 419 U.S. 379, 390, 95 S.Ct.

533, 540, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring)).

Applying these guidelines, we cannot dispose of Bradbury's claim based solely on the Supreme Court's summary affirmance of *Johnson v. Rockefeller,* because we cannot say with certainty that the precise issues raised by Bradbury were necessarily decided by that summary affirmance, even if we assume that the three-judge panel's rationale was adopted by the Supreme Court. In the first place, Bradbury bases his claim in part on the First Amendment. No First Amendment claim was advanced or considered in *Johnson v. Rockefeller.* In the second place, the three-judge panel's rationale for upholding the New York statute against the due process challenge is inapposite. The three-judge panel in *Johnson v. Rockefeller* decided that the New York statute did not deny prisoners their due process rights because the statute's restriction on inmates' rights to participate in a marriage ceremony was simply a penalty which was "well within New York's power to prescribe." 365 F.Supp. at 380. By contrast, the Florida Department of Corrections did not intend to use Rule 33–3.13 as a penalty in addition to the sentence imposed by the trial court. Instead, the Department of Corrections justifies the rule on the basis of two interests—security and rehabilitation. Since Rule 33–3.13 was not designed to operate as an additional penalty, the three-judge panel's disposition of the prisoner's due process claim in *Johnson v. Rockefeller* cannot be interpreted as deciding the due process claim raised by appellant Bradbury. Although *Johnson v. Rockefeller* noted a rehabilitation argument, it was advanced by the prisoners, not by the prison officials, and the panel avoided any examination of that issue. 365 F.Supp. at 380.

standard in *Martinez,* the Supreme Court ruled that the Department of Corrections "failed to show that the broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." 416 U.S. at 415, 94 S.Ct. at 1812. A regulation banning expression of inflammatory, political, racial, and religious views was struck down because it was "not narrowly drawn to reach only material that might be thought to encourage violence nor [was] its application limited to incoming letters." 416 U.S. at 416, 94 S.Ct. at 1812.

The second Supreme Court decision illuminating the appropriate standard of review is *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). In that case, the North Carolina Department of Corrections prohibited inmates from soliciting other inmates to join the Prisoners' Union, barred Union meetings, and declined to deliver Union literature mailed in bulk. The Union claimed that the Department's actions violated the First and Fourteenth Amendments, but the Supreme Court upheld the prison regulations. The Court decided that "[t]he ban on inmate solicitation and group meetings ... was rationally related to the reasonable, indeed to the central, objectives of prison administration," 433 U.S. at 129, 97 S.Ct. at 2539, the restrictions on bulk mailings were "reasonable," 433 U.S. at 130, 97 S.Ct. at 2540, and that "First Amendment associational rights ... must give way to the reasonable considerations of penal management." 433 U.S. at 132, 97 S.Ct. at 2541.

Although it has been argued that the *Jones* Court applied a new and different standard than that applied in *Martinez,*[5] and although we concede some tension between the two decisions, we are not prepared to say that the standards cannot be reconciled. As we view *Jones,* the Supreme Court did follow the *Martinez* two-part test. *Jones* added a gloss on the first part of the test: a regulation will be taken to further a substantial governmental interest if it is rationally related to that interest. 433 U.S. at 129, 97 S.Ct. at 2539. Also, *Jones* did not overlook the second part of the test; the Court concluded that the regulations were "drafted no more broadly than they need be to meet the perceived threat." 433 U.S. at 133, 97 S.Ct. at 2541.

Both *Martinez* and *Jones* accord substantial deference to prison officials' decisions. *Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807; *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 126, 97 S.Ct. at 2538. *Martinez* spelled out the reasons underlying this deference:

> [C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

416 U.S. at 405, 94 S.Ct. at 1807 (footnote omitted). In *Jones,* the district court had noted that, while the prison officials "sincerely believed that the very existence of the Union will increase the burdens of administration and constitute a threat to essential discipline and control," the district court was nonetheless "unable to perceive why it is necessary or essential to security and order in the prisons to forbid solicitation of membership in a union permitted by the authorities." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 123–24, 97 S.Ct. at 2536–37. On appeal, the Supreme Court stated:

> Without a showing that these beliefs were unreasonable, it was error for the District Court to conclude that appellants needed to show more. In particular the burden was not on appellants to show affirmatively that the Union would be "detrimental to proper penological objectives" or would constitute a "present danger to security and order." ...

5. *See* Calhoun, *The Supreme Court and the Constitutional Rights of Prisoners: A Reappraisal,* 4 Hastings Const.L.Q. 219, 234 (1977); Note, *Standards of Judicial Review for Conditions of Pretrial Detention,* 63 Minn.L.Rev. 457, 468 (1979); Comment, *Constitutional Law: Standard of Review in Pretrial Detainees' Claims,* 19 Washburn L.J. 609, 611 (1980).

433 U.S. at 127–28, 97 S.Ct. at 2538–39 (citations omitted).

In recognition of the judiciary's deference, the Supreme Court has repeatedly stated:

> Such considerations [of prison administration] are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Bell v. Wolfish,* 441 U.S. at 547–548, 99 S.Ct. at 1878–1879 (quoting *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806); *see Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 128, 97 S.Ct. at 2539.

■ Although deference to prison administrators is "wide-ranging," *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 126, 97 S.Ct. at 2538, courts are not required to abdicate their responsibility to redress constitutional violations. "When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez,* 416 U.S. at 405–06, 94 S.Ct. at 1807–08. *See Rhodes v. Chapman,* 452 U.S. 337, 362, 101 S.Ct. 2392, 2407, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring); *United States v. Bailey,* 444 U.S. 394, 419, 100 S.Ct. 624, 639, 62 L.Ed.2d 575 (1980) (Stevens, J., concurring) (courts should not give "undue deference to" prison officials' expertise); *Goulden v. Oliver,* 442 U.S. 922, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979) (Blackmun, J., dissenting from denial of certiorari) (*Jones* and *Martinez* "reaffirm[ ] the principle that prison regulations are subject to constitutional scrutiny"). Thus, for example, prison administrators' bald assertions of security interests will not justify the loss of a prisoner's fundamental rights. *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (statute requiring racial segregation in prisons violated the Fourteenth Amendment).

In sum, Supreme Court precedent suggests a two-part standard for evaluating prison regulations regarding inmate marriages. First, the prison regulation must further a substantial governmental interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction on marriage must be no greater than necessary to protect the governmental interest involved. This two-part standard should be applied with a wide-ranging deference to the expert judgment of prison administrators.[6]

Before applying the *Martinez-Jones* standard, we must also recognize the summary judgment posture of the instant case. Rule 56(c) of the Federal Rules of Civil Procedures states the summary judgment standard:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In evaluating the propriety of summary judgment, "courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983) (quoting *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1369 (11th Cir. 1982); *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This court has repeatedly said that, even if the parties agree on the basic facts, summary judgment may be inappropriate if the parties "disagree about the factual inferences that should be drawn from these facts." *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d at 1296; *Clemons v. Dougherty Coun-*

---

6. *Cf. Madyun v. Franzen,* 704 F.2d 954, 959 (7th Cir.1983) (standard of review for prisoner rights of free exercise of religion—(1) whether the state regulation has an important objective; (2) whether the restraint on religious liberty is reasonably adapted to achieve that objective).

ty, Ga., 684 F.2d at 1369; *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981) (Unit A); *Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.,* 420 F.2d 1211, 1213 (5th Cir.1969); *NLRB v. Smith Industries, Inc.,* 403 F.2d 889, 893 (5th Cir.1968); *Keating v. Jones Development of Missouri, Inc.,* 398 F.2d 1011, 1013 (5th Cir.1968). Put another way, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Clark v. Union Mutual Life Insurance Co.,* 692 F.2d 1370, 1372 (11th Cir. 1982); *Clemons v. Dougherty County, Ga.,* 684 F.2d at 1369; *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1030 (5th Cir. 1982).

Applying the standard derived from *Martinez* and *Jones,* and taking into consideration the summary judgment posture of this case, three considerations combine to persuade us that summary judgment was inappropriately granted.

■ First, taking all reasonable inferences in favor of Bradbury, as we must given the summary judgment posture of this case, we are not fully satisfied that there are no genuine issues of fact as to whether the instant rule is rationally related to the two state interests asserted by appellee Wainwright, *i.e.,* security and rehabilitation. With respect to security, the Department has advanced four potential security problems. First, the Department states that security is threatened by the introduction of outside individuals into the prison.[7] Viewing the factual inferences favorably to Bradbury, this problem is not clearly apparent in Bradbury's case. Vivian Sapp is currently an approved visitor of Bradbury's. The marriage ceremony can be solemnized by a prison employee who is a notary public.

The record does not indicate that the marriage would require the introduction into the prison of any other outside person.[8] Sapp would not obtain additional visiting privileges after the marriage. Record on Appeal at 72 & 74.

The second potential security problem asserted by the Department concerns the removal of security personnel from other assignments to handle the security requirements of marriage ceremonies. However, the record does not support the Department's assertion. If the ceremony would involve only Bradbury, Sapp and a Department employee who is a notary public, there is no record support for the Department's assertion that additional security would be required.

The third potential security problem raised by the Department is that the marriage ceremony would conflict with normal visitations and other program activities. The record does not contain any evidence to support the bald assertion of a security problem in this regard. The conflict between a simple ceremony and a normal visit has not been explained and is not self-evident.

The fourth potential security problem, unlike the first three, would seem to implicate a more valid security concern. The Department states that it would be required to transport inmates to outside locations to fulfill marriage requirements, presumably to obtain the marriage license. However, there is no evidence in the record to indicate the gravity of the problem.[9]

On the limited record before us, the Department has adduced what can only be described as an extremely weak security justification for the instant rule. In light of opposing factual inferences, we cannot

---

**7.** As a result, visiting areas are located near the outside gate so that outside individuals have limited access into the prison. The Department states that "[t]he safest introduction of outside persons into the prison is no deeper than the visiting park area." Record on Appeal at 83–84.

**8.** A notary public can solemnize the rites of matrimony in Florida, and the Union Correc-

tional Institution has employees who are notaries public. Record on Appeal at 71 & 74.

**9.** Indeed, the Department permits some inmates to marry pursuant to section 2 of Rule 33–3.13. Presumably, the Department is willing to assume the increased security risks in a limited number of cases.

conclude on this record that the Department's security interests justify a summary judgment in its favor.

With respect to the rehabilitation interest advanced by the Department, the Department concedes that it did not consider what effect Rule 33–3.13 might have on Bradbury. However, the Department bases the Rule's application on its perception of the general effect that inmate marriages would have on rehabilitation. According to the Department, prisoner marriages pose two potential problems for rehabilitation. The Department claims that, if married in prison, an inmate could be frustrated with his inability to enter into a normal responsible marital relationship. This potential for frustration derives from the inmate's usual inability to provide financial support for the other spouse and his inability to meet his spouse's companionship, physical, or sexual needs. The second asserted problem for rehabilitation is the Department's claim that an inmate could become suspicious of the spouse's faithfulness. According to the Department, the potential for frustration and suspicion could inhibit rehabilitation. In response to the Department's argument, Bradbury cites studies [10] indicating that marriage promotes rather than inhibits rehabilitation. He also points out that several states permit prisoners to marry.[11]

Although questions of what factors either promote or inhibit rehabilitation and the degree thereof are matters peculiarly within the province of the Department, and thus are entitled to the greatest deference, the paucity of the evidence placed before us by the Department at this stage and the reasonable inferences in opposition pointed to by Bradbury, in combination with the con-

siderations discussed below, lead us to conclude that summary judgment was inappropriate in this case.

The second consideration leading to our conclusion that summary judgment was inappropriate in this case is our belief that further development of the facts is required for proper application of the *Martinez-Jones* standard. With respect to the first part of the test, "the court must look to see whether the prison's . . . practices actually further the [ ] objectives [of rehabilitation and security]." *Lynott v. Henderson,* 610 F.2d 340, 343 (5th Cir.1980); *Rudolph v. Locke,* 594 F.2d 1076, 1077 (5th Cir.1979). The second part of the test is particularly difficult to apply based on the facts adduced to this point. There is no evidence in the present record addressed to the issue of whether Rule 33–3.13 imposes no greater restriction than necessary to further the state interests of security and rehabilitation. Nor did the district court address that question. *See Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (reversed summary judgment because the district court's order was "opaque and unilluminating as to either the relevant facts or the law"). A similar question was considered in *Rudolph v. Locke,* 594 F.2d 1076 (5th Cir.1979). In that case, state prisoner Rudolph filed a § 1983 claim, based on the First Amendment, challenging a prison regulation which prohibited anything from "go[ing] from one inmate to another in the Segregation Unit," where Rudolph was voluntarily confined because of the threat on his life. *Id.* at 1077. The district court denied relief based on the complaint, the answer, motion papers, and an affidavit from Rudolph. The former Fifth Circuit reversed and remanded so that further evi-

---

**10.** In support of his position, Bradbury cites a study which he claims showed that released convicts who resumed residence with their wives experienced the lowest recidivism rate. D. Glaser, *The Effectiveness of a Prison and Parole System,* 379 (1964). Bradbury's reference to this study is subject to some question since the study itself acknowledged that "the low failure rates of married releasees is largely accounted for by the fact that they are older than the average releasee, and, . . . failure rates decline with increasing age at release." *Id.* For references to Glaser's study, *see* Comment,

*Standard of Review in Prisoners' Rights Litigation and the Constitutional Right to Marry,* 12 U.S.F.L.Rev. 465, 490 (1978); *Special Project, The Collateral Consequences of a Criminal Conviction,* 23 Vand.L.Rev. 929, 1168 (1970). Bradbury also refers us to those who support rules permitting inmates to marry, *see, e.g.,* ABA Standards for Criminal Justice, § 23–8.-6(a)(i) (1982).

**11.** *See* Comment, *Prison Inmate Marriages: A Survey and a Proposal,* 12 Rich.L.Rev. 443, 450–58 (1978) (reviewing state positions).

dence could be taken. *Id.* The court declined to rely on the state's "bare assertion that the regulation 'is an appropriate means of maintaining . . . security in the segregation units.'" *Id.* (quoting from Record on Appeal). In the court's view, the case could not be decided without "specific evidence to support that assertion," and an explanation as to "why this regulation is preferable to other possible measures which restrict first amendment rights less severely." *Id.*

■ Finally, prudential reasons concerning the novelty of the issue and the potential impact of a decision on the merits militate in favor of denying summary judgment. In *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948), the Supreme Court decided that the record in the case presented an unsatisfactory basis for summary judgment, given the importance of the question raised. Justice Jackson, writing for the majority, stated:

> We do not hold that in the form the controversy took in the District Court that tribunal lacked power or justification for applying the summary judgment procedure. But summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation, contracting and practice.

> We consider it the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts. While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide.

334 U.S. at 256–57, 68 S.Ct. at 1034 (footnote omitted). Of course, Bradbury's case is not overrun with complexities like an antitrust case might be, to take but one example. But complexity does not stand as the only prudential reason for insisting upon cautious use of the summary procedure. Novel application of legal principles and potential impact are also relevant considerations. 10A Wright, Miller & Kane, Federal Practice & Procedure § 2725 (1983). Neither the Supreme Court nor any circuit court of appeals has given plenary consideration to the issue presented by Bradbury.[12] Such circumstances constitute a factor counseling against a summary decision.

The combined effect of the foregoing reasons persuades us that summary judgment was inappropriate in this case.

REVERSED and REMANDED.