Robert LAWSON, Plaintiff–Appellee,
Cross–Appellant,

v.

Richard L. DUGGER, etc., et al.,
Defendants–Appellants,
Cross–Appellees.

No. 86–5774.

United States Court of Appeals,
Eleventh Circuit.

Dec. 21, 1987.

Carl J. Zahner, Jason Vail, Asst. Attys. Gen., Dept. of Legal Affairs, State of Fla., Tallahassee, Fla., for defendants-appellants, cross-appellees.

Peter M. Siegel, Florida Justice Institute, Inc., Miami, Fla., for plaintiff-appellee, cross-appellant.

Before JOHNSON and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

ATKINS, Senior District Judge:

Appellants, Florida prison officials, appeal from a judgment following a bench trial, holding unconstitutional the acts of the Florida Department of Corrections which restricted members of the class—prisoners—from access to the religious literature of the Hebrew Israelite faith and from otherwise exercising their right to religious expression within the prison context. The appellee cross-appellants also claimed their rights to due process were violated by the appellants' regulations and procedures for the screening of incoming religious literature.

The district court found, after recounting the evidence adduced at the trial, "that no incident of violence, racially oriented or otherwise, has occurred within the Florida prison system as a result of the introduction of Hebrew Israelite literature or the practice, by inmates, of the Hebrew Israel-

---

* Honorable C. Clyde Atkins, U.S. Senior District Judge for the Southern District of Florida, sitting by designation.

ite religion." Memorandum Opinion at 14. The court determined that evidence which the appellants did proffer "consisted of speculation and predictions by various prison officials and expert witnesses that the banned publications would (or could) engender violence among inmates." *Id.*

We hold, as did the district court, that the practices of the appellants in denying to appellees their rights freely to exercise their religious beliefs during their incarceration and appellants' failure to apply a standard policy protective of appellees' religious freedoms are violative of their rights under the first amendment.

The district court having properly afforded the injunctive relief sought, we affirm and remand to the district court for the purpose of requiring appellants to submit a plan for censoring literature that does not violate the procedural protections afforded by the due process clause of the fourteenth amendment.

### The Facts

The district court's comprehensive recital of the facts in its findings is amply supported by the record, and we adopt the relevant portions here.

The parties to this class action have stipulated to the fact that the Hebrew Israelite faith is a *bona fide* religion. It has existed in splintered fashion since early in the twentieth century. The headquarters of the sect is the Temple of Love, located in Miami, Florida. It was founded in about 1981. From this location, Yahweh ben Yahweh, who was formerly known as Moses Israel, presides as the leader of the Hebrew Israelite faithful. Among the facilities housed within the Temple is a printing complex, through which the organization prints and distributes copies of books and religious tracts which set out the tenets and history of the sect.

The Hebrew Israelite faith, as developed in the literature distributed from the Temple of Love, is directed at black Americans, although there appears to be no explicit exclusion from membership of other races. The religion teaches that all blacks living in the United States are descendants of the "lost tribe of Israel", which, it is claimed, settled in biblical times on the west coast of Africa, only to be forcibly dispersed and removed to the Western Hemisphere by the slave trade of the seventeenth and eighteenth centuries.

Yahweh ben Yahweh, writing as Moses Israel, further instructs his followers that white society and white-dominated Jewish and Christian mainline churches have deliberately deceived American blacks since their introduction to this continent by concealing from them their true heritage as Black Hebrew Israelites. This historical/theological concept is supported in the literature by selective, and highly edited, quotations from the Hebrew Israelite Holy Bible.

By means of limited biblical quotations, often wholly rewritten, interspersed throughout the remainder of the Hebrew Israelite literature, Yahweh ben Yahweh teaches his followers that God is black, that Moses, Abraham, Jesus Christ, and all other important biblical figures were black, and that Yahweh ben Yahweh himself is the present incarnation of the god Yahweh. Among the practical tenets, or laws, of the faith are the belief that the Bible forbids a man to shave his beard, proscribes the use of illegal drugs and the practice of homosexuality, and requires adherence to dietary laws which forbid the eating of pork products. As do most religions, this one admonishes the faithful that prayer, study and adherence to the laws of the church are necessary to a proper life.

A central tenet of the subject religion, and one that is promoted in many of the Hebrew Israelite publications, is the belief that the "white man", in a collective sense, is the enemy of the black race, and that black people have been punished by God for their failure to adhere to the commands of Yahweh by being subjugated by oppressive white rule. Thus, a repeated message of these materials is that white society has continually mistreated black Americans since their arrival as slaves, and that the god Yahweh, through the messianic figure of Yahweh ben Yahweh, offers the faithful salvation at some future time by leading

his followers back to their homeland, Israel.

The publications of the Temple of Love which have been refused admittance by chaplains or other officials at various facilities of the Florida Department of Corrections consist of the following items, all of which were introduced in evidence at the trial of this cause:

Plaintiffs' Exhibit # 4—*The Holy Bible*

This publication consists of a standard, edited King James Bible, to which six prefatory pages have been added, together with eighty-six titled illustrations. While most of these drawings serve to simply illustrate that various Biblical characters were black persons, several depict either acts of atrocity (e.g., an illustration of the mutilation and killing, by white men, of a pregnant black woman and her fetus entitled "Blacks Hate Whites Forever" included at page 120 of this 1,170–page text) or constitute disparagement of so-called "false religions" (at page 1068, a mocking caricature of the Roman Catholic Pope entitled "The First Beast.")

Plaintiffs' Exhibit # 5—*You Are Not a Nigger—Yahweh, God of Gods*

In this, the most polemical of the works which the appellants have excluded from the various prisons, author Moses Israel presents "the world's best kept secret" ' i.e., the lineage of black Americans as the lost tribe of Israel, as lessons to be presented to new and potential converts. The remainder of this book consists of a series of short tracts, mixing theological exhortations and slanted historical accounts of the black experience in this country, culminating in the message that the god Yahweh will return to liberate the Hebrew Israelite from domination by the "white devil."

Plaintiffs' Exhibit # 6—*Let My People Go*

This volume contains a collection of newspaper clippings of lynchings, mob attacks and other incidents of racial violence in turn-of-the-century America, letters from inmates in the Florida prison system complaining of their inability to practice the faith, and selected excerpts from "You Are Not A Nigger," Plaintiffs' Exhibit # 5.

Plaintiffs' Exhibit # 7—*100 Years of Lynchings*

In the only document not originally printed by the Temple of Love, the reader finds a roughly chronological compilation of newspaper clippings covering an eighty-year period (1870–1950) which describe various lunchings of black men and other racially motivated violence throughout the southern United States.

Plaintiffs' Exhibit # 7A—*Divine Dietary Laws for Hebrew Israelites*

This pamphlet sets out a regimen of prescribed and proscribed foods for followers of the Hebrew Israelite religion, based loosely on the Jewish dietary laws set out in the books of Leviticus and Deuteronomy. The chief practical aspect of these laws for the plaintiff class is the avoidance of pork and pork products.

Plaintiffs' Exhibit # 8—*The Jail Ministry Notebook*

This five-page, mimeograph pamphlet is essentially a teachers' manual for followers who wish to instruct others by means of the Hebrew Israelite texts discussed above and contains a preliminary lesson in the Hebrew language. It should be noted that the author's introduction to this guide admonishes followers of Yahweh ben Yahweh who are inmates in state institutions to remain obedient to authorities while incarcerated.

Plaintiffs' Exhibit # 9—*Yahweh Judges America*

The most recent of the Temple of Love publications is a purely prophetic vision of the redemption of the black race by Yahweh ben Yahweh at an unspecified future time.

Plaintiffs' Exhibit # 70—*The Lamb's Letter*

This two-page form instructs the would-be convert in the proper method of registration for membership in the sect, and constitutes an application for an "Israelite name."

All of the above documents, except "Yahweh Judges America," which was released

in 1985, have been sent (primarily by mail, though some copies were personally distributed by Temple elders) to one or more of the appellee class members. They were rejected by the appellants.[1]

The worship services observed by the Hebrew Israelite inmates, when permitted, consist mainly of Bible study guided by the biblical interpretations set out in the Temple of Love literature. Associated with these services is the wearing, by participants, of a white turban and a Star of David, the latter being customarily worn by the inmate, where permitted.

At least four members of the appellee class[2] have been prevented by one or more of the appellants from receiving some or all of the Hebrew Israelite literature addressed to them, and on specific occasions from practicing their preferred religion within the institutions.

The Dade Correctional Institution Chaplain has consistently prohibited receipt by inmates of the religious texts described above. In doing so, the Chaplain has notified recipients when materials were returned but has not informed them of their right to appeal to the Chaplaincy Services Coordinator. While Hebrew Israelite prisoners are not permitted to hold unsupervised worship services, they may pray individually in the prison chapel at Dade Correctional and may wear religious medallions. There were, at the time of trial, approximately twenty Hebrew Israelite inmates at Dade Correctional Institution. No evidence was adduced of any violence or disciplinary problems attributable to the activities of these inmates related to the study or dissemination of this literature.

Drew Washington, the last of the appellees to testify, has been held in seven Florida state prisons since his commitment in 1981. While at Union Correctional Institution in late 1981, Washington was informed that all materials which he had requested from the Temple of Love had been returned for the stated reason that they were "racist and inflammatory." Washington's requests to receive visits from elders, to wear religious accessories, to meet for group study in the prison chapel, and to grow his beard in keeping with the mandate of the Holy Bible were also denied by the Union chaplain. Washington filed a grievance in response to these denials, which was itself denied. Similar blanket denials of Washington's requests to worship and to receive literature were made by the chaplains at appellants' Avon Park and Belle Glade facilities during his subsequent assignments to those prisons.

While at Belle Glade, Washington and others had access to one copy of the Holy Bible and the "Yahweh, God of Gods" text (Plaintiffs' Exhibits # 4 and 5), which were shared among the dozen Hebrew Israelites incarcerated there. No evidence of violence or disruptive acts arising out of the activities of this group of inmates has been presented to the Court.

Appellants adduced evidence of two nonviolent incidents which involved individual inmates who professed to follow the Hebrew Israelite faith. Melvin Smith, who was chaplain at the Lawtey Correctional Institution in February, 1984, testified that during one of several informal prayer meetings which Hebrew Israelite inmates were permitted to hold in the prison chapel, some inmates expressed concern over the racist content of some of the prayers and slogans being uttered by appellee James Evans, necessitating the curtailment of that prayer session. Chaplain Smith could not recount any other incident occurring at Lawtey which involved study or worship activities of Hebrew Israelite inmates.

---

1. The district court acknowledged that persons of other races and creeds may find some or all of these publications distasteful. It is not, however, the role of the court to evaluate these items by their effect upon the sensibilities of some persons, but rather to decide, weighing the appellees' interests under the Constitution against the legitimate governmental interests of the state, whether their admission to the prisons is constitutionally mandated.

2. The district court found that these four inmates (James Evans, David Lucas, Lawrence Jones and Drew Washington) are sincere in their belief in and desire to practice the Hebrew Israelite religion.

Vernon Farley, a corrections officer at Marion Correctional Institution, testified that he was required to discipline a Hebrew Israelite inmate, Eugene Wade, who had engaged in a verbal altercation with another inmate. While Wade was being restrained by prison guards, he uttered threats against the officer and his family interspersed with Biblical quotations. Prior to Wade's three week stay at Marion, and after his disciplinary removal from the prison population, there were no further disciplinary problems occasioned by the religious activities of the remaining Hebrew Israelite inmates.

At all of the appellants' penal institutions, literature and worship services of recognized religions, including the Jewish, Roman Catholic, Black Muslim (Islam) and various Protestant denominations, are permitted within the prisons, subject to oversight by the prison chaplain and in accordance with applicable prison regulations. Religious diets are also arranged upon the application by an inmate and the chaplain's determination that such request is legitimate (i.e., professing Black Muslim inmates are routinely afforded a pork-free diet).

Over a two-year period commencing February, 1982, officials in charge of the Dade County Jail[3] permitted elders of the Hebrew Israelite Temple of Love to come into the jail, to conduct worship services, and to distribute Hebrew Israelite literature among those prisoners who requested it. While the new faith was enthusiastically accepted by the prisoners upon its initial introduction to the Dade County Jail, with some fifty prisoners participating in worship services, interest quickly waned to the point that, within two years, the temple representatives voluntarily ceased their visits to the county facility. No incidents of violence or disruption occurred during this two-year period which could be traced to the introduction of Hebrew Israelite literature and worship practices.

3. The Dade County Jail is not under the authority or supervision of defendant Louie L. Wainwright and the Florida Department of Correc-

*The District Court Correctly Found the Restrictions Unconstitutional*

The appellants conceded in the trial that the Hebrew Israelite faith is a *bona fide* religion, and that the Hebrew Israelite publications, with one exception, were religious in nature. All eight publications, according to official policy, are banned from the prison in their published form. *See* Letter from Appellant Counselman to Yahweh ben Yahweh, Appellees' Exhibit 86. The asserted reason is that portions of each are racist and inflammatory and pose a threat to the security and order of the Florida prison system (R5: 179-2).

The appellees do not dispute that at least some of the literature is racist in character. They admit that some is derogatory of other races and religions. Nevertheless they showed, and the district court agreed, that the racist and derogatory religious literature is not a cause of violence or other disruption of prison life.

This proof supports the opinions of the appellees' experts that racist literature will have no negative impact so long as correctional officials do not make it an issue.

### 1. First Amendment Implications

First amendment interests are implicated in the censorship or exclusion of literature by prison officials. In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed. 2d 224 (1974), the Court determined the proper standard for deciding whether a particular regulation or practice relating to inmate correspondence constitutes an impermissible restraint of first amendment liberties. It held that:

> [Prison officials] must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

tions, but is a county facility housing predominantly maximum security pretrial detainees whose average length of confinement is 34 days.

*Id.* at 413, 94 S.Ct. at 1811. The first part of the *Martinez* test has been refined so that the regulation or rule will be taken to further a substantial government interest if it is rationally related to that interest. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bradbury v. Wainwright,* 718 F.2d 1538 (11th Cir.1983).

■ The prohibition against Hebrew Israelite literature and worship services in the prison is broader than any legitimate penological objective would support. While appellants permit literature and worship services of recognized religions, including the Jewish, Roman Catholic, Black Muslim, and Protestant faiths, they prohibit them for members of the Hebrew Israelite faith. They have banned the literature because, they assert, it could engender violence among inmates, and thereby undermine prison security. They have returned literature requested by inmates for the stated reasons that it is "racist and inflammatory." A restriction does not fall within the rules and regulations to which prisoners are necessarily subject if it is not neutral and without regard to content of the expression affected. *Pell v. Procunier,* 417 U.S. 817, 828, 94 S.Ct. 2800, 2807, 41 L.Ed. 2d 495 (1974) (citing *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972)). Appellants' bare assertion that the restrictions imposed on prisoners of the Hebrew Israelite faith are appropriate means to prevent potential violence among inmates will not justify a prisoner's loss of a fundamental right. *Bradbury,* 718 F.2d at 1543.

We affirm the injunction and do so to assure uniform and continuous application of appellants' rules and regulations consistent with the first amendment rights of the appellees.

### 2. *Procedure for Censorship of Literature*

The district court held that the challenged regulations on their face satisfy the minimal due process requirements for claims involving prisoner mail censorship established in *Martinez.* The *Martinez* Court held:

> An inmate [should] be notified of the rejection of a letter written by or addressed by him.... The author of that letter [should] be given a reasonable opportunity to protest that decision, and ... complaints [should] be referred to a prison official other than the person who originally disapproved the correspondence.

*Martinez,* 416 U.S. at 418–419, 94 S.Ct. at 1814.

The Admissible Reading Rule, *Fla.Admin.Code Ann.* r. 33–3,012 (1987), provides that written notice be given to each inmate addressee whose books are returned, describing the publication and the rule under which it is returned. It further provides for review, within fourteen days, by the Chaplaincy Services Coordinator (i.e., someone other than the initial decision maker). The district court concluded that "the minimal procedural safeguards of *Martinez* are ostensibly provided by existing regulations." Memorandum Opinion at 37.

Appellees challenge these procedures on the grounds that they do not require (1) the Chaplain to inform the inmate of the title and publisher of the excluded publication, (2) a statement of reasons for the exclusion, (3) that the inmate be given a meaningful opportunity to be heard, (4) notice to the sender and an opportunity for that party to be heard, (5) automatic review as in the Georgia and South Carolina procedures and (6) a time standard for deciding appeals.

■ We are constrained to hold that the cause be remanded to the district court on this issue, for the submission by the appellants of a plan for censoring literature, in accordance with the procedural due process requirements set forth in *Martinez.* We are concerned with the deficiency in the procedures applied when literature is excluded, including, but not limited to, the failure of the Admissible Reading Rule to provide notice and opportunity to the send-

er to protest the exclusion, and the reasons for the exclusion.

AFFIRMED in part and REMANDED.