**Robert Lee LAWSON, et al., Plaintiffs,**

v.

**Louie L. WAINWRIGHT, et al., Defendants.**

**No. 83–8409–CIV.**

United States District Court, S.D. Florida, Miami Division.

July 18, 1986.

---

Randall C. Berg, Jr., Peter M. Siegel, Florida Justice Institute, Inc., Miami, Fla., for plaintiffs.

Carl J. Zahner, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE came on for a non-jury trial before the Court commencing Monday, May 19, 1986 and was heard over a five day period. The Court received extensive pre-trial memoranda, heard the testimony of twelve expert and fifteen lay witnesses, and the argument of counsel for the parties. In addition, the Court has closely examined the numerous exhibits offered by the parties. On June 9, 1986, the parties submitted post-trial memoranda presenting their views of the applicable legal standards to be applied by the Court in this matter.

THE COURT, having carefully considered all of the evidence presented, the pertinent portions of the record, the various memoranda of law, the argument of counsel, and the applicable law, and being otherwise fully advised in the premises, enters herein its memorandum opinion con-

taining findings of fact and conclusions of law.

## THE NATURE OF THE ACTION

This is a statewide class action which challenges the alleged refusal by officials of the Florida Department of Corrections to permit inmates in the Department's penal institutions who profess adherence to the Hebrew Israelite faith to receive the religious literature of that faith and to engage in the practice of the Hebrew Israelite religion in the manner allowed to inmate members of other religious groups.

The plaintiff class, as certified by the Court's Order of January 2, 1986 is defined as:

All persons currently confined, or who will be confined in the future, in institutions operated by Florida's Department of Corrections and who are members of, or seek to learn about, the Hebrew Israelite faith and who desire to receive and discuss religious literature prepared by the Temple of Love, and who have been denied the opportunity to receive such religious literature, discuss such religious beliefs with other individuals, and worship according to the tenets of the Hebrew Israelite faith.

Count I of the plaintiffs' Amended Complaint challenges, on First Amendment grounds, the Department of Corrections' refusal to permit those inmates who profess to follow the Hebrew Israelite faith from receiving religious books and pamphlets published by the Temple of Love, which is the Miami headquarters of the sect. Count I further alleges that the defendants have prevented the plaintiffs from enjoying the free exercise of their religion, by prohibiting worship services, prayer meetings, observance of dietary laws, and the wearing of religious symbols.

In Count II, the plaintiff class claims that their rights to equal protection and due process of law have been abridged by the procedures utilized by the defendants, under color of state regulations, in circum-scribing the plaintiffs' religious practice in violation of the Fourteenth Amendment.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. *Findings of Fact*

#### *Procedural History*

1. On August 5, 1983, Robert Lee Lawson, then an inmate at Hendry Correctional Institution, filed a *pro se* verified complaint in this Court pursuant to 42 U.S.C. § 1983 suing Louie L. Wainwright, Secretary, Florida Department of Corrections, C.W. Sprouse, Superintendent at Hendry, L.G. Stephens, Educational Supervisor, and Stephen Spencer, the prison chaplain.

2. The complaint charged, *inter alia*, that the plaintiff was a black Jew and a member of the Temple of Love, and that the plaintiff was informed on June 28, 1983 that religious literature addressed to plaintiff from the Temple of Love was being returned by the Hendry prison chaplain. The complaint sought declaratory, injunctive and monetary relief.

3. On March 12, 1985, plaintiff Lawson, now represented by counsel, filed his First Amended Complaint, naming Secretary Louie L. Wainwright, Chaplaincy Services Coordinator William S. Counselman, C.W. Sprouse, Paul Coburn and Stepen Spencer as defendants.[1] The Amended Complaint sought, *inter alia*, declaratory and injunctive relief on behalf of the class members and damages only as to plaintiff Robert Lee Lawson.

4. Defendants' Motions to Dismiss and for Summary Judgment were denied on October 9, 1985. They filed their Answer on October 25, 1985.

5. On April 12, 1985, Lawrence Jones, an inmate at the Dade Correctional Institution, moved to join as a party plaintiff or to intervene. On October 9, the Court permitted Lawrence Jones to join as a party plaintiff.

---

1. Defendant Stepen Spencer was dismissed without prejudice by the Court on May 19, 1986 upon the plaintiffs' failure to furnish proof of service of process.

6. After an evidentiary hearing the Court, on January 2, 1986, certified this cause as a class action, defining the plaintiff class as described above.

7. There are currently 31 correctional institutions under the control and supervision of the Florida Department of Corrections. Evidence presented to the Court indicates that the number of inmates within those institutions who are either practicing Hebrew Israelites or have expressed a desire to learn about the religion is between 75 and 100.[2]

8. Robert Lee Lawson was released from incarceration in May, 1985 and is no longer a member of the class. His complaint for monetary damages against the defendants pursuant to 42 U.S.C. § 1983, originally Count III of the Amended Complaint in this cause, has been severed from this class action which seeks only declaratory and injunctive relief.

*The Court's Findings*

9. The parties to this class action have stipulated to the fact that the Hebrew Israelite faith is a *bona fide* religion. It has existed in splintered fashion since early in the twentieth century. The headquarters of the sect is the Temple of Love, located in Miami, Florida, and it was founded in about 1981. From this location, Yahweh ben Yahweh, who was formerly known as Moses Israel, presides as the leader of the Hebrew Israelite faithful. Among the facilities housed within the Temple is a printing complex, through which the organization prints and distributes copies of books and religious tracts which set out the tenets and history of the sect.

10. The Hebrew Israelite faith, as developed in the literature distributed from the Temple of Love[3], is directed at black Americans, although there appears to be no explicit exclusion from membership by other races. The religion teaches that all blacks living in the United States are descendants of the "lost tribe of Israel", which, it is claimed, settled in biblical times on the west coast of Africa, only to be forcibly dispersed and removed to the Western Hemisphere by the slave trade of the seventeenth and eighteenth centuries.

Yahweh ben Yahweh, writing as Moses Israel, further instructs his followers that white society and white-dominated Jewish and Christian mainline churches have deliberately deceived the American blacks, since their introduction to this continent, by concealing from them their true heritage as Black Hebrew Israelites. This historical/theological concept is supported in the literature by selective, and highly edited, quotations from the Hebrew Israelite Holy Bible.[4]

By means of limited biblical quotations, often wholly rewritten, interspersed throughout the remainder of the Hebrew Israelite literature, Yahweh ben Yahweh teaches his followers that God is black, that Moses, Abraham, Jesus Christ, and all other important biblical figures were black, and that Yahweh ben Yahweh himself is the present incarnation of the god Yahweh. Among the practical tenets, or laws, of the faith are the belief that the Bible forbids a man to shave his beard, proscribes the use of illegal drugs and the practice of homosexuality, and requires adherence to dietary laws which forbid the eating of pork products. As do most religions, this one admonishes the faithful that prayer, study and adherence to the laws of the church are necessary to a proper life.

11. A central tenet of the subject religion, and one that is promoted in many of the Hebrew Israelite publications, is the belief that the "white man", in a collective sense, is the enemy of the black race, and

---

**2.** Defense counsel stated at the hearing on plaintiffs' Motion for Class Certification held on December 6, 1985, that it estimated the Hebrew Israelite population at 75. Abishag Israel, a member of The Temple of Love staff in charge of correspondence with prisoners, testified that she has corresponded with between 75 and 100 inmates within the Florida Corrections System.

**3.** *See* description of the contested publications at paragraph 12, *infra.*

**4.** The nature and import of these illustrations is discussed at paragraph 12, *infra.*

that black people have been punished by God for their failure to adhere to the commands of Yahweh by being subjugated by oppressive white rule. Thus, a repeated message of these materials is that white society has continually mistreated black Americans since their arrival as slaves, and that the god Yahweh, through the messianic figure of Yahweh ben Yahweh, offers the faithful salvation at some future time by leading his followers back to their homeland, Israel.

12. The publications of the Temple of Love which have been refused admittance by chaplains or other officials at various facilities of the Florida Department of Corrections consist of the following items, all of which were introduced in evidence at the trial of this cause:

Plaintiffs' Exhibit # 4—*The Holy Bible*

This publication consists of a standard, edited King James Bible, to which six prefatory pages have been added, together with eighty-six titled illustrations. While most of these drawings serve to simply illustrate that various Biblical characters were black persons, several depict either acts of atrocity (e.g., an illustration of the mutilation and killing, by white men, of a pregnant black woman and her fetus entitled "Blacks Hate Whites Forever" included at page 120 of this 1,170–page text) or constitute disparagement of so-called "false religions" (at page 1068, a mocking caricature of the Roman Catholic Pope entitled "The First Beast".)

Plaintiffs' Exhibit # 5—*You Are Not a Nigger—Yahweh, God of Gods*

In this, the most polemical of the works which the defendants have excluded from the various prisons, author Moses Israel presents "the world's best kept secret"; i.e., the lineage of black Americans as the lost tribe of Israel, as lessons to be presented to new and potential converts. The remainder of this book consists of a series of short tracts, mixing theological exhortations and slanted historical accounts of the black experi-

ence in this country, culminating in the message that the god Yahweh will return to liberate the Hebrew Israelite from domination by the "white devil".

Plaintiffs' Exhibit # 6—*Let My People Go*

This volume contains a collection of newspaper clippings of lynchings, mob attacks and other incidents of racial violence in turn-of-the-century America, letters from inmates in the Florida prison system complaining of their inability to practice the faith, and selected excerpts from "You Are Not A Nigger", Plaintiffs' Exhibit # 5.

Plaintiffs' Exhibit # 7—*100 Years of Lynchings*

In the only document not originally printed by the Temple of Love, the reader finds a roughly chronological compilation of newspaper clippings covering an eighty-year period (1870–1950) which describe various lynchings of black men and other racially motivated violence throughout the southern United States.

Plaintiffs' Exhibit 7A—*Divine Dietary Laws for Hebrew Israelites*

This pamphlet sets out a regimen of prescribed and proscribed foods for followers of the Hebrew Israelite religion, based loosely on the Jewish dietary laws set out in the books of Leviticus and Deuteronomy. The chief practical aspect of these laws for the plaintiff class is the avoidance of pork and pork products.

Plaintiffs' Exhibit # 8—*The Jail Ministry Notebook*

This five-page, mimeograph pamphlet is essentially a teachers' manual for followers who wish to instruct others by means of the Hebrew Israelite texts discussed above and contains a preliminary lesson in the Hebrew language. [It should be noted that the author's introduction to this guide admonishes followers of Yahweh ben Yahweh who are in-

mates in state institutions to remain obedient to authorities while incarcerated.]

### Plaintiffs' Exhibit # 9—*Yahweh Judges America*

The most recent of the Temple of Love publications is a purely prophetic vision of the redemption of the black race by Yahweh ben Yahweh at an unspecified future time.

### Plaintiffs' Exhibit # 70—*The Lamb's Letter*

This two-page form instructs the would-be convert in the proper method of registration for membership in the sect, and constitutes an application for an "Israelite name."

All of the above documents, except "Yahweh Judges America", which was released in 1985, have been sent (primarily by mail, though some copies were personally distributed by Temple elders) to one or more of the plaintiff class members and were rejected by the defendants.[5]

13. The worship services observed by the Hebrew Israelite inmates, when permitted, consist mainly of Bible study guided by the biblical interpretations set out in the Temple of Love literature. Associated with these services is the wearing, by participants, of a white turban and a Star of David, the latter being customarily worn by the inmate, where permitted, at all times. Practice of the faith also requires that adherents observe a pork-free diet in accordance with the Divine Dietary Laws.

14. At least four members of the plaintiff class[6] have been prevented by one or more of the defendants from receiving some or all of the Hebrew Israelite literature addressed to them, and on specific occasions from practicing their preferred religion within the institutions.

15. Plaintiff James Evans has been an adherent of the Hebrew Israelite religion during the last five years of his incarceration at various institutions within the Florida prison system. In 1982, Evans was placed in the Union Correctional Institution after pre-trial detention in the Dade County Jail, where Evans was converted to the Hebrew Israelite faith by elders of the Temple of Love who were permitted to conduct services in that county facility and to distribute the temple's books.

Upon his arrival at Union Correctional Institution, Evans requested receipt of Hebrew Israelite publications and for permission to hold religious services and to obtain a pork-free diet. When these requests were denied by the prison chaplain[7], Evans filed a grievance appeal on August 5, 1982.[8] During the course of this grievance

---

5. The Court acknowledges that persons of other races and creeds may find some or all of these publications distasteful. It is not, however, the role of this Court to evaluate these items by their effect upon the sensibilities of some persons, but rather to decide, weighing the plaintiffs' interests under the Constitution against the legitimate governmental interests of the state, whether their admission to the prisons is constitutionally mandated.

6. The Court finds that these four inmates (James Evans, David Lucas, Lawrence Jones and Drew Washington) are sincere in their belief in and desire to practice the Hebrew Israelite religion.

7. Incoming religious literature addressed to an inmate is to be screened according to the procedure set out in the Department's Admissible Reading Material rule, *Fla.Admin.Code* § 33–3.-12, which provides, in pertinent part:

(1)(b) Religious materials shall be subject to the provisions of this rule, except that:

1. Religious publications shall not require inclusion in the Approved Periodical List,
2. The institutional chaplain, rather than the superintendent or his designee, shall be the reviewing authority, and
3. Any decision of a chaplain disapproving a religious publication may be appealed to the Chaplaincy Services Coordinator within 14 days of notice of the disapproval.

This regulation does not require that an inmate be informed of this alternative appeal route, nor of the nature of the rejected book or periodical.

8. The Florida Administrative Code, at Chapter 33, Section 3.07, establishes a general grievance procedure through which an inmate, by completing a standardized grievance form, may object to a denial of privileges, a disciplinary action, etc. Plaintiff Evans, and most other inmates, followed this general grievance procedure in objecting to the refusal of various prison chaplains to admit the Hebrew Israelite books

appeal, a neutral attorney fact-finder was appointed, who concluded that "the prohibition of such literature is unsupported by any factual evidence and is thus inconsistent with Department [of Corrections] rules and existing practices." Factfinder's Report, Grievance Appeal of James Evans, Case No. U82–82 (Plaintiffs' Exhibit # 15). Evans' appeal was ultimately denied by the Department on January 24, 1983, and he was not permitted to practice his faith nor receive the rejected literature while incarcerated at Union.

After a transfer to the defendants' Avon Park facility in April, 1983, Evans was permitted by the chaplain there to participate in Hebrew Israelite worship services and to obtain copies of the Holy Bible and "You Are Not a Nigger" (Plaintiffs' Exhibits # 4 and 5). At Lawtey Correctional Institution, to which Evans was subsequently transferred, no Hebrew Israelite books or worship were permitted. When Evans attempted to hold unsupervised prayer meetings with fellow followers at Lawtey, he was retransferred to Union Correctional. Upon attempting to convene inmates for a. prayer meeting while at Union, Evans was transferred to Florida State Prison, which houses the state's Death Row and its most troublesome maximum security inmates. The chaplain assigned to Florida State Prison also prevented Evans from receiving any requested religious literature.

Evans was finally retransferred to Union Correctional Institution in the fall of 1985. There, Evans possessed copies of Plaintiffs' Exhibits # 4 and 5 and shared these with other Hebrew Israelites, but all requests for additional materials were refused. On three occasions in 1986, Evans was mailed religious works (twice by the Temple of Love and once by his wife). In each case, the materials were rejected by chaplain Eldon Cornett, the Supervising Chaplain at Union, or by his assistant, H.

Wayne Priest, on the ground that "the book(s) has many racist and inflammatory statements." Plaintiffs introduced into evidence three internal memoranda written by Cornett or Priest to defendant Counselman notifying him of the rejections and the stated reasons therefore. (Plaintiffs Exhibits # 92–94) Although inmate Evans received copies of these cursory notices, they gave no hint of the nature of the rejected material and did not advise the inmate of any direct means of appeal from these adverse decisions.

Thus, at Union Correctional Institution (on three separate occasions) and at Lawtey, all of plaintiff Evans' requests for opportunities to study and to practice the religion of his choice were denied, while at Avon Park and in the Dade County Jail, the identical literature and worship methods were permitted and caused no incidents of violence or disruption. On no occasion when Evans' requests for Hebrew Israelite materials were denied was Evans informed of his right to appeal the local chaplain's decisions directly to the Chaplaincy Services Administrator.[9]

16. David Lucas, another member of the plaintiff class, has been incarcerated at the Florida State Prison since September 21, 1981, and became an adherent of the Hebrew Israelite faith in that year. His request to receive the Holy Bible (Plaintiffs' Exhibit # 4) and the Divine Dietary Laws (Plaintiffs' Exhibit # 7A) was denied by the prison chaplain, although Lucas was allowed to possess for some time while at Florida State Plaintiffs' Exhibit # 5, "You Are Not A Nigger". During 1984, plaintiff Lucas made requests to be placed on a religious, pork-free diet and to receive visits from Temple of Love elders, which were likewise denied. Some prisoners at this institution currently possess one or more of the banned publications in spite of the chaplain's practice of returning them upon

because they were unaware of the availability of the Rule 33–3.12 appeal.

**9.** The availability of this alternate appeal procedure is noted in Rule 33–3.12. Evidence was presented to the Court that copies of all perti-

nent regulations are available to inmates in the prison library. However, there is no standardized form available to inmates who wish to pursue this avenue of appeal, as exists for the widely used Rule 3.07 grievance.

receipt. No evidence of violence or disruption traceable to the introduction or use of this literature in the Florida State Prison was presented to the Court.

17. Plaintiff Lawrence Jones adopted the Hebrew Israelite religion prior to his incarceration in the Florida state prison system in April, 1981. After a short stay at Dade Correctional Institution, where receipt of Hebrew Israelite literature was prohibited, Jones was transferred to Belle Glades Correctional Institution, where he enjoyed access to such materials in the possession of other inmates. During his latest stay at Dade Correctional, commencing in December, 1983, Jones requested and obtained a visit by one of the elders of the Temple of Love, who was not allowed to conduct a formal service, but did engage in pastoral visits with three inmates.

The Dade Correctional Institution chaplain has consistently prohibited receipt by inmates of the religious texts described in Paragraph 10, *supra*, and in doing so has notified recipients when materials were returned but has not informed them of their right to appeal to the Chaplaincy Services Coordinator. While Hebrew Israelite prisoners are not permitted to hold unsupervised worship services, they may pray individually in the prison chapel at Dade Correctional and may wear religious medallions. There were, at the time of trial, approximately twenty Hebrew Israelite inmates at Dade Correctional Institution. No evidence was adduced of any violence or disciplinary problems attributable to the activities of these inmates related to the study or dissemination of this literature.

18. Drew Washington, the last of the plaintiff inmates to testify, has been held in seven Florida state prisons since his commitment in 1981. While at Union Correctional Institution in late 1981, Washington was informed that all materials which he had requested from the Temple of Love had been returned for the stated reason that they were "racist and inflammatory". The plaintiff's requests to receive visits from elders, to wear religious accessories, to meet for group study in the prison chapel, and to grow his beard in keeping with the mandate of the Holy Bible were also denied by the Union chaplain. Washington filed a grievance in response to these denials, which was itself denied. Similar blanket denials of Washington's requests to worship and to receive literature were made by the chaplains at defendants' Avon Park and Belle Glades facilities during his subsequent assignments to those prisons.

While at Belle Glades, Washington and others had access to one copy of the Holy Bible and the "Yahweh, God of Gods" text (Plaintiffs' Exhibits # 4 and 5), which were shared among the dozen Hebrew Israelites incarcerated there. No evidence of violence or disruptive acts arising out of the activities of this group of inmates has been presented to the Court.

19. Defendants adduced evidence of two non-violent incidents which involved individual inmates who professed to follow the Hebrew Israelite faith. Melvin Smith, who was chaplain at the Lawtey Correctional Institution in February, 1984, testified that during one of several informal prayer meetings which Hebrew Israelite inmates were permitted to hold in the prison chapel, some inmates expressed concern over the racist content of some of the prayers and slogans being uttered by plaintiff James Evans, necessitating the curtailment of that prayer session. Chaplain Smith could not recount any other incident occurring at Lawtey which involved study or worship activities of Hebrew Israelite inmates.

Vernon Farley, a corrections officer at Marion Correctional Institution, testified that he was required to discipline a Hebrew Israelite inmate, Eugene Wade, who had engaged in a verbal altercation with another inmate. While Wade was being restrained by prison guards, he uttered threats against the officer and his family interspersed with Biblical quotations. Prior to Wade's three week stay at Marion, and after his disciplinary removal from the prison population, there were no further disciplinary problems occasioned by the re-

ligious activities of the remaining Hebrew Israelite inmates.

20. At all of the defendants' penal institutions, religious literature and worship services of recognized religions, including the Jewish, Roman Catholic, Black Muslim (Islam) and various Protestant denominations, are freely allowed within the prisons, subject to oversight by the prison chaplain and in accordance with applicable prison regulations.[10] Religious diets are also arranged upon the application by an inmate and the chaplain's determination that such request is legitimate (i.e., professing Black Muslim inmates are routinely afforded a pork-free diet.)

21. Over a two-year period commencing in February, 1982, officials in charge of the Dade County Jail[11] permitted elders of the Hebrew Israelite Temple of Love to come into the jail, to conduct worship services, and to distribute Hebrew Israelite literature among those prisoners who requested it. While the new faith was enthusiastically accepted by the prisoners upon its initial introduction to the Dade County Jail, with some fifty prisoners participating in worship services, interest quickly waned to the point that, within two years, the temple representatives voluntarily ceased their visits to the county facility. No incidents of violence or disruption occurred during this two-year period which could be traced to the introduction of Hebrew Israelite literature and worship practices.

22. The Court finds that no incident of violence, racially oriented or otherwise, has occurred within the Florida prison system as a result of the introduction of Hebrew Israelite literature or the practice, by inmates, of the Hebrew Israelite religion. The evidence which the defendants did proffer at trial consisted of speculation and predictions by various prison officials and expert witnesses that the banned publica-

tions would (or could) engender violence among inmates.

23. By an order entered by the United States District Court for the Middle District of Florida on April 20, 1971 in *Moore v. Tompkins* (Case No. 69–263–CIV–J and cases consolidated therewith), the Florida Department of Corrections was required to permit the introduction into Florida State Prison of texts and periodicals of the Black Muslim faith. In the opinion of several expert witnesses proffered by both sides, the Black Muslim literature, as it existed in 1971, was very similar in content and ideological perspective to the Hebrew Israelite literature at issue here. None of the defendants' witnesses were able to recount any incidents of violence or disruption, racially motivated or otherwise, which could be attributed to the introduction of Black Muslim literature on or after April 20, 1971 at the Florida State Prison. In fact, Vernon Fox, one of defendants' religion experts, testified that the only violent disturbance within a Florida prison which was in any way related to the distribution of religious literature was caused by the *exclusion* of that literature by prison authorities.

24. In August of 1985, William E. Counselman, Chaplaincy Services Administrator for the Florida Department of Corrections, convened a meeting of chaplains from all of the department's corrections facilities. Among other subjects discussed at this meeting, Counselman stressed the need for a uniform application of the regulations and policies of the Department of Corrections by the chaplains at the various state prisons. At that meeting, Counselman communicated the announced policy of the Department that prison chaplains were to treat all religions held by inmates in an even-handed manner. Counselman testi-

---

**10.** The defendants justified their prohibition on unsupervised gatherings of Hebrew Israelite inmates for study or prayer by citing Rule 33–3.-02(10), which provides: "No inmate or group of inmates shall be given control or authority over other inmates."

**11.** The Dade County Jail is not under the authority or supervision of defendant Louie L. Wainwright and the Florida Department of Corrections, but is a county facility housing predominantly maximum security pretrial detainees whose average length of confinement is 34 days.

fied that this policy dictated the allowance of a pork-free diet to sincere Hebrew Israelites, as well as access to chapel facilities, the wearing of non-contraband religious insignia, and the arrangement of visits by recognized elders of the faith, provided that no specific risk to security was presented by these activities.

25. On September 16, 1985, Counselman addressed a letter (Plaintiffs' Exhibit 86) to the Hebrew Israelite leader, Yahweh ben Yahweh, in response to the latter's September, 1981 inquiry as to the admissibility of Hebrew Israelite publications in the state prisons. Counsel stated in this letter that all of the books in question (Plaintiffs' Exhibits # 4, 5, 6, 7, 7A, 8 and 70) would be admissible provided that specified illustrations and text portions were removed together with "all derogatories [sic] comments concerning other faiths and religions". The Counselman letter also expressed the Department's position that Hebrew Israelite inmates are to be afforded the same opportunity to practice their faith as is given to members of other recognized religions, including the right to hold prayer meetings and to attend worship services conducted by Temple elders in accordance with standardized procedures for such visits (e.g., elders must first visit with the prison chaplain and describe the nature of the proposed service.)

26. The Court finds that, prior to the August, 1985 chaplains' meeting convened by Administrator Counselman, there was unquestionably sporadic and uncoordinated application of prison regulations and policies among the Florida prison officials in their dealings with Hebrew Israelite inmates.

The same lack of uniformity is apparent in those instances in which written explanations were provided to inmates for the rejection of religious literature addressed to them. Examples of the varied rationales relied upon for the refusal to admit these publications include assertions that they

are "derogatory to other faiths and races" (Plaintiffs' Exhibit # 86), were the subject of pending litigation (Plaintiffs' Exhibit # 16, 17), espouse a "philosophical position ... which tends to be inflammatory, derogatory and racist" (Plaintiffs' Exhibit # 29), were "disapproved by chaplain" (Plaintiffs' Exhibit 31), are "racially inflammatory" (Plaintiffs' Exhibits # 33, 68) or "would seriously affect the good order and operation of the facility and jeopardize security." (Plaintiffs' Exhibit # 75)

On two occasions, the rejection of the religious literature was predicated on inapplicable department regulations. Jim Annis, chaplain of the Hendry Correctional Institution in June, 1981, returned Hebrew Israelite material to the Temple of Love on the stated ground that it was not "on the approved list of periodicals for inmates."[12] (Plaintiffs' Exhibit # 34). The later rejection, by Union Correctional chaplain Eldon Cornett, of fourteen copies of the Temple of Love Publication "Our True History— The World's Best Kept Secret" on August 4, 1982 (Plaintiffs' Exhibit # 68) addressed to plaintiff Drew Washington was predicated on the Department of Corrections Routine Mail Rule, *Fla.Admin.Code* § 33–3.04 because it was "racially inflammatory and derogatory to the Christian faith." In fact, the Routine Mail Rule in effect at that time provided (in pertinent part) that incoming mail may only be restricted where it contains "information which, if communicated, would create a *clear and present danger of violence* and physical harm to a human being." *Fla.Admin.Code* § 33–3.04(6)(c) (emphasis added).

Since the August, 1985 Chaplains' Meeting covered by Rev. Counselman, there has been a *bona fide* effort to accommodate, through uniform policies, the religious practices of Hebrew Israelite inmates. Nevertheless, application of these policies remains sporadic, due, at least in part, to the fact that the Chaplaincy Services policies have not been adequately communicat-

---

**12.** *Fla.Admin.Code* § 33–3.04 explicitly provides that religious literature is exempted from the

approved reading list requirement.

ed to the individual prison chaplains. Thus, there is no uniform policy, applied and maintained at all of the defendants' institutions, which protects the constitutional rights at issue here.

27. The testimony of several expert witnesses in the fields of religion and prison administration was presented to the Court. Allyn Sieloff, former Director of the Pennsylvania Department of Corrections, testified for the plaintiffs that during his tenure in that position (1968–73), the introduction of strident Black Muslim literature into the Pennsylvania prisons was resisted at first, but that its eventual introduction had only positive effects on the security and discipline of the prisons. Sieloff, along with Dr. Richard Swanson of the University of Florida Department of Psychology, expressed the opinion that the study of, and adherence to, a religious system would tend to improve inmates' self-image and decrease the likelihood of violence.

The defendants, in turn, presented a series of expert and fact witnesses, predominantly corrections officers and chaplains from the Florida and other state prison systems, who expressed the uniform opinion that the Hebrew Israelite literature at issue in this cause is "racist and inflammatory" and would present a threat to the security and order of any prison institution in which it was introduced. None of the defendants' witnesses, as previously noted in these findings, testified to the occurrence of any violent incident, in any state penal system, which was traceable to the introduction of religious literature of any kind.

28. The Court finds that none of the publications admitted into evidence as Plaintiff's Exhibits Nos. 4, 5, 6, 7, 7A, 8, 9 and 10 contain subject matter which, when taken as a whole and in its entirety, "advocates or encourages riot, insurrection, escape, disruption of the institution, violence or violation of law or Department or institution rule ..." or "otherwise presents a clear and substantial threat to the security, order or rehabilitative objectives of the Correctional System, or to the safety of

any person." *Fla.Admin.Code* §§ 33–3.-12(6).

29. The Court further finds that the religious practices and observances which the plaintiffs seek to require the defendants to permit are not of a nature which would encourage or incite violence, escape or disruption, or in any way threaten the legitimate interests of the Department of Corrections in the security and order of the correctional institutions under its supervision.

## II. *Conclusions of Law*

1. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3). The plaintiffs' cause of action is predicated on 42 U.S.C. § 1983. The declaratory judgments sought herein are authorized by 28 U.S.C. §§ 2201 and 2202. Attorney's fees, costs and expenses are authorized by 42 U.S.C. § 1988.

2. While a great degree of deference must ordinarily be accorded to the reasoned policy decisions of prison administrators, the courts must nonetheless discharge their duty to protect fundamental rights of prisoners which are violated by the application of a prison regulation or policy. *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974).

3. Likewise, although it is well established that a prison inmate's enjoyment of constitutional rights may be circumscribed, where required, by the legitimate governmental interests of the prison administration, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

4. In Count I of their amended complaint, the plaintiff class seeks declaratory and injunctive relief from various practices and regulations of the defendants which, they allege, violate their rights to free exercise of the Hebrew Israelite religion un-

der the First and Fourteenth Amendments. Count II seeks relief from the alleged deprivation by defendants of the plaintiffs' right to procedural due process caused by the manner in which the defendants have reviewed, and subsequently rejected, religious literature addressed to the plaintiffs and various requests for permission to worship in a manner permitted other religious prisoners.

■ 5. The validity of a state regulation, or a particular application thereof, which restricts or prohibits an inmate's exercise of a fundamental right must be evaluated under the "least restrictive means" standard. *Shabazz v. Barnauskas,* 790 F.2d 1536 (11th Cir.1986); *Bradbury v. Wainwright,* 718 F.2d 1538 (11th Cir.1983).

In *Shabazz,* the Court of Appeals applied a less restrictive means test to a prisoner's claim that the Florida State Prison's "no beard rule" violated his right to freely exercise the Islamic faith, which forbids male members from shaving their facial hair. The court affirmed the district court's ruling that the "no beard rule" was not violative of the plaintiff's First Amendment rights because there existed no less restrictive means to accomplish the prison administration's legitimate policy goal of ensuring positive identification of its inmate population.

In *Bradbury v. Wainwright, supra,* in which the Court of Appeals for this circuit established the "less restrictive means" test as the standard for deciding prisoners' constitutional claims, the court reversed a district court's grant of summary judgment in favor of defendant Louie L. Wainwright upon a prisoner's claim that Florida Department of Corrections regulations which severely limit a prisoner's right to marry were violative of the First and Fourteenth Amendments' guarantees of freedom of association and privacy.

Defendants in the instant case urge this Court to adopt a "rational relation" standard of review in deciding the claims of the plaintiff class. Likewise, the defendants in *Bradbury* urged the appellate court to uphold the challenged regulations merely upon a showing that they were "reasonably related to an important governmental interest". The *Bradbury* court, however, construing the applicable Supreme Court rulings in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) and *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), held that such a standard was overly deferential to the prison authorities where a prisoner's fundamental rights were implicated. From those authorities, the Court of Appeals established the following two-part test, to be applied with a "wide-ranging deference to the expert judgment of prison administrators":

> First, the prison regulation must further a substantial governmental interest. A regulation will be taken to further such an interest if it is rationally related to it.
>
> Second, a regulation's restriction on [a fundamental right] must be no greater than necessary to protect the governmental interest involved.

*Bradbury, supra,* 718 F.2d at 1543.

■ Defendants are able to satisfy the first prong of this "less restrictive means" test, given its undemanding "rational relation" standard. It is clear that the defendant's practice of routinely banning the religious literature at issue in this case bears a rational relation to the substantial governmental interest of avoiding strife among inmates. As to the second prong of the *Bradbury* test, however, the Court concludes, for the reasons discussed hereafter, that the outright ban of the literature is a greater than necessary restriction on the plaintiffs' right to freely exercise their religion.

The defendants in the present class action have urged this Court to defer to the reasoned judgment of the defendant prison officials in their decision to ban the publications and various religious practices associated with the Hebrew Israelite faith. According to the defendants, "[O]nly a showing that the corrections officials did not make a reasoned decision would justify this

Court substituting its judgment for that of the corrections officials." Defendants' Trial Memorandum (Supplement), page 3, *citing Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. at 125, 97 S.Ct. at 2535 (1977).

The authorities cited by the defendants in support of this deferential standard are simply not apposite in the instant case. To begin with, in *Jones, supra*, the case most heavily relied upon by defendants in this context, the Supreme Court itself acknowledged that "First Amendment rights are barely implicated in this case", 433 U.S. at 130, 97 S.Ct. at 2540, noting that the challenged regulation affected only one of several *methods* of communication by prisoners, having no effect on the *content* of those communications.

In other cases cited by defendants, the challenged prison regulation involved activities which do not rise to the level of fundamental rights. For instance, *Jersawitz v. Hanberry*, 783 F.2d 1532 (11 Cir.1986) and *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), which do hold to a virtual "abuse of discretion" standard in evaluating prison regulations, involved content-neutral restrictions imposed upon representatives of the news media who sought to interview individual prisoners. These holdings were thus based on the respective courts' findings that alternate means of communication with the press remained available and that the restrictions were applied to all inmates in the prison in a neutral fashion. Such cases are obviously distinguished from that which is before this Court, since the Hebrew Israelite inmates incarcerated in Florida's prisons have no alternate means to acquire the desired literature, and the censorship of their literature is anything but content-neutral. (*See also Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), in which the Court upheld a content-neutral restriction on the receipt by inmates of hard-cover books, but which allowed prisoners to receive the identical texts in paperback form, on the ground that hard covers provided opportunities for concealment of weapons and contraband.)

■ Thus, in each case cited by the defendants in support of their contention that a mere "rational relationship" between the challenged prohibitions and a legitimate governmental interest is sufficient to defeat the plaintiffs' claims, there was not the subjective, content-based censorship of pure religious speech that is evidenced in the instant case. Because the regulations challenged here allow censorship based solely on the subjective evaluation of prison officials, and because plaintiffs have no available alternative in exercising their religion or in obtaining desired literature, the "less restrictive means" test is the proper standard by which to evaluate the plaintiffs' claims.

6. Count I of the plaintiffs' amended complaint alleges that the policies and procedures followed by the officials of the Florida Department of Corrections impermissably violate the First Amendment rights of inmates in that system who seek to study and to worship according the Hebrew Israelite faith. Specifically, the plaintiffs allege that their right to free exercise of their chosen faith is violated by the following actions of the defendants:

1.) The exclusion from the state prisons of Hebrew Israelite literature

2.) The prohibition on gathering of Hebrew prisoners for the purpose of engaging in prayer and discussion

3.) The prohibition, in some institutions, against prisoners wearing a "Star of David", the adopted symbol of the Hebrew Israelite faith

4.) The unavailability, to some plaintiffs, of a pork-free diet

5.) The prohibition against inmates owning and using prescribed head coverings

6.) The failure of various prison chaplains to arrange for visits to the prisons by recognized elders of the Hebrew Israelite faith

This pattern of resistance by chaplains throughout the Florida prisons is indicative of a bias against, or, at best, a grudging

acceptance of, the Hebrew Israelite religion by the individual chaplains, the pervasive nature of which necessitates the Court's intervention in this dispute.

The resistance which led up to the instant litigation is best illustrated by the following extracts from defendants' post-trial brief:

The Florida Department of Corrections recognizes that the Hebrew Israelite faith is religious in nature. This is not to place an imprimatur upon the Hebrew Israelites in that other organizations such as satanic cults and white supremacist groups also contain this character. However, the Hebrew Israelite faith while recognized as a religion and, therefore, afforded that status within The Florida Department of Corrections is not necessarily approved of by the chaplains or chaplaincy services of the Department of Corrections in that it is felt that the Hebrew Israelite faith is damaging to the rehabilitative objectives of the institution.

Defendants' Post-Trial Brief at pp. 23–24.

In other words, the individual conflicts which culminated in the instant lawsuit arose as much from the philosophical approach taken by chaplains within The Florida Department of Corrections as it did from any substantive or legal differences. This approach has led to the anomaly that the defendants proffer, on the one hand, that they would admit the Hebrew Israelite *literature* once all "objectionable portions" were removed, while maintaining the position that the *religion*, in its totality, is itself objectionable. Even up to the time of trial in May, 1986, there existed only a grudging acceptance among responsible officials of the department regarding the Hebrew Israelite faith as expressed by inmates under their supervision.

The same "approach" over "substance" attitude is evident in the defendants' justification to their initial wholesale ban of the contested literature.

The Department of Corrections does not necessarily object to a single phrase in any one of the Hebrew Israelite publica-

tions but rather to the overall racist flavor of the literature which the individual phrases and comments give it.

*Id.* at 21.

7. Based on the representations of the defendants, through counsel, made during the trial of this cause, in their closing argument, and again in their post-trial brief (in which the defendants were specifically requested by the Court to set out the Department of Corrections' current policy on the matters at issue), the Court has made the following compilation of relevant state policies:

1.) On the exclusion of religious literature

"The religious literature of The Hebrew Israelites is admissible into the institutions of the Department of Corrections so long as the portions of those documents which have been determined to violate the regulations of the admissible reading rule § 33–3.-012(6)(c) and (e) are removed in order to give them a benign character."

Defendants' Post-Trial Brief at p. 20.

2.) On the gathering of inmates for prayer and discussion

"It is the policy of The Florida Department of Corrections that religious services, prayer meetings and the like should be permitted to all inmates regardless of their nature but always within the constraints of the need for the maintenance of security within the institution."

*Id.* at 26–27.

3.) On the availability of a pork-free diet

"It is the policy of The Department of Corrections that this [dietary] regulation should apply equally to the Hebrew Israelites as to any other religious group within the institutions and that the Hebrew Israelite inmates, once they have identified themselves as Hebrew Israelites be provided with the type of religious meal which is possible under the constraints of the regulation noted above and which their

religious teachers state is appropriate for their faith."

*Id.* at 24–25.

4.) On the holding of formal religious services within the prisons

See Number 2.), *supra,* for departmental policy on religious worship services and prayer meetings.

5.) On wearing religious headdress

"[T]he wearing of religious headdresses, etc., is permissible during religious services.... The wearing of religious headgear, such as turbans, would be normally restricted to the religious services themselves."

*Id.* at 27–28.

6.) On the wearing of religious medallions

"The wearing of religious medallions is permitted within the institutions of The Department of Corrections [but such items] must be obtained through proper channels and may not be made of contraband material in violation of other regulations of the Department of Corrections."

*Id.* at 28.

7.) On the observance of religious holidays

The Department shall make an effort "to arrange work assignments and schedules to accommodate the beliefs and practices of inmates whose religion requires them to abstain from work on religious holydays," but cautions that practical considerations may require limitations on this privilege.

*Id.* at 30.

A careful review of the stated policy of the department, in light of the factual background of this class action, has led the Court to conclude that progress has been made since the filing of this suit in August, 1983. A significant step forward was achieved at the August, 1985 Chaplains' Meeting referred to previously, where the director of chaplaincy services imparted the Department's position on many aspects of this suit directly to the individuals responsible for its implementation in the prisons. To the extent that these policies are consistent with the Court's instant Order, the policies and recommended remedial actions of the defendants are accepted within the totality of this opinion.

However, there still exist substantial communication problems and/or failure to implement uniformly the announced departmental policies. To the extent that the recent policy of accomodation regarding Hebrew Israelite inmates has been applied, it has been on a selective basis (i.e., implementation by some chaplains in favor of some groups). Thus, although treatment of religious minorities in the Florida prisons has distinctly improved, the current implementation of these regulations and policies as applied to Hebrew Israelite inmates does not satisfactorily safeguard the fundamental rights of those individuals to exercise their religious beliefs.

8. The primary ground for the plaintiffs' suit, and that which occupied the central place in this litigation, is the challenge to the constitutionality of the defendants' exclusion of virtually all of the Temple of Love publications which have been mailed to inmates in the Florida prisons over the past five years.[13]

The stated basis upon which the defendants justify this exclusion is Rule 33–3.12 of the Florida Administrative Code, entitled "Admissible Reading Material". Under subsection 33–3.12(1)(b) of this administrative rule, authority to review publications of a religious nature is assigned to the prison chaplain or his designee. Thus, in each instance relevant to this action, the initial decision to prohibit the introduction of Hebrew Israelite literature was made by the prison chaplain at the institution where the addressee was incarcerated.[14]

---

**13.** See Findings of Facts, paragraph 12, supra.

**14.** A pervasive aspect of this lawsuit, and a compelling reason for the Court's grant of certification as a class action, has been the lack of uniformity among the chaplains at the various state prisons in their interpretation and application of departmental regulations. At an earlier stage of this litigation, in fact, counsel for the defendants informed the Court that, absent such

The Admissible Reading Material Rule does not give a local chaplain unbridled discretion in deciding whether certain literature is suitable for introduction to the prison; instead, the rule sets out the following criteria, *inter alia,* for review.

Reading material shall be disapproved if it:

(c) is dangerously inflammatory *in that* it advocates or encourages riot, insurrection, escape, disruption of the institution, violence or violation of law or Department or institution rule, the violation of which would present a serious threat to the security order, or rehabilitative objectives of the institution;

or

(e) otherwise presents a *clear and substantial threat* to the security or rehabilitative objectives of the correctional system, or to the safety of any person. *Fla.Admin.Code,* § 33–3.12(6)(c), (e) (emphasis added)

Thus, by its own regulation, the Department of Corrections may exclude religious literature only where it is shown that the excluded book or periodical "advocates or encourages riot, insurrection, escape, etc." or "otherwise presents a clear and substantial threat" to the legitimate government objective of safety, security and rehabilitation.

9. There has been no evidence presented to the Court, either in the course of trial or by pre-trial submissions of deposition testimony and exhibits, to justify the defendants' refusal, under the above-cited regulation, of Plaintiffs' Exhibits # 4, 5, 6, 7, 7A, 8, 9 and 70. The documents do not, on their face, advocate or encourage any

unlawful or disruptive actions by inmates (or any other person), and no testimony was presented which would suggest that their introduction and use within the prisons presents a "clear and substantial threat" to any of the defendants' legitimate penological goals.

On the contrary, the evidence shows that, in those institutions in which the subject literature was made available to inmates (either officially or surreptitiously), no incidents of violence or disciplinary problem occurred which could be attributed to the use of these documents for study and worship.

■ 10. By their failure to present any evidence of violence, disruption, or actual threats to the security and order of any institution in which one or more inmates participated in Hebrew Israelite worship and/or possessed the sect's publications, the defendants fall short of satisfying their evidentiary burden in opposing the plaintiffs' claims. While it is well settled that prison administrators cannot be held to prove with certainty that serious adverse consequences will follow the introduction of literature or religious practices into the prison environment, *Martinez, supra,* 416 U.S. at 414, 94 S.Ct. at 1811, neither may the defendants defeat the plaintiffs' claims of constitutional deprivation by speculative assessment of potential dangers.[15]

The former Fifth Circuit, in *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir.1978) ruled as unconstitutional portions of the Texas Department of Corrections' prison regulations applied to bar the receipt by inmates of publications which prison administrators

certification, any ruling of the Court would be applied only to the individual inmate litigant, thus inviting repetitive prisoner suits.

15. In a decision based on remarkably similar factual and legal issues, the former Fifth Circuit in *Walker v. Blackwell,* 411 F.2d 23 (5th Cir. 1969), reversed the trial court's ruling that exclusion of Black Muslim religious literature from the Texas prisons could be sustained solely upon the subjective impression of the prison warden that such materials were "inflammatory." The censored materials consisted of two

editions of the periodical "Muhammed Speaks", which featured evocative depictions of blacks being subjected to torture by whites which were similar, if not identical, to the Hebrew Israelite literature objected to here. *Id.* at 28, n. 7. Because the *Walker* court found that the challenged publications contained no direct incitement to the Black Muslim reader to engage in any physical violence, the district court's finding that the materials were inflammatory was held to be clearly erroneous.

considered "inflammatory".[16] In reversing the district court's decision in favor of the Texas Corrections Department, the Court noted:

> This Court has traditionally viewed alleged inflammatory publications as a whole, and has sustained prisoners' requests to receive them when there was *no direct incitement to physical violence.* At the same time, we have cautioned that a *demonstrated* inflammatory effect might permit prison officials to withhold the publications. Significantly, in the present case, Texas prison officials' complaints were never keyed to demonstrated incitement to physical violence ...

*Id.* at 760–61, n. 7. (emphasis added).

In a more recent prison censorship decision, the Fifth Circuit has reiterated its requirement in *Guajardo* that prison officials must satisfy their evidentiary burden by a showing of "proven objective factors". *Hernandez v. Estelle,* 788 F.2d 1154 (5th Cir.1986). In affirming the trial court's denial of injunctive relief which would have mandated the distribution in the Texas prisons of "antiwhite" publications, the Fifth Circuit relied upon the defendants' showing of "established turmoil in the Texas Department of Corrections immediately preceeding and during the time that the episode of censorship took place", including riots, work stoppages, and inmate occupation of prison facilities. *Id.*

In the instant case, as noted in the above findings of fact, the defendants are unable to point to a single instance of violence or disruption in any of the Florida prisons which demonstrate a relationship between the banned religious items and the recited threats to security and order within the Florida Department of Corrections. The Court has found that the only two such "incidents" for which evidence was adduced involved inmates James Evans and Eugene Wade (see paragraph 17, *supra*), whose disciplinary problems appear to have stemmed more from their personal characteristics than from any influence of the banned literature. This conclusion is supported by the fact that, as soon as each of these disruptive inmates was removed from the institution in which the altercations occurred, the remaining Hebrew Israelite inmates continued their activities without further incident.

11. This Court's requirement that the prison authorities come forward with some objective evidence to justify the outright ban of religious activities of inmates, and that any such restriction be accomplished by the "least restrictive means", is not new to this Circuit. In *Rudolph v. Locke,* 594 F.2d 1076 (5th Cir.1979), a prisoners' suit which challenged an Alabama regulation prohibiting prisoners from receiving written communications while confined in segregation units, the former Fifth Circuit declared that the state's "bare assertion that the regulation 'is an appropriate means of maintaining security ... in the segregation units' is not enough. It must adduce specific evidence to support that assertion, and it must explain why this regulation is preferable to other possible measures which restrict first amendment rights less severely." *Id.* at 1077.

12. Count I of the Amended Complaint alleges that the defendants' misapplication of the regulations which govern review of incoming religious literature has resulted in the unconstitutional deprivation of their protected liberty interests under the First Amendment's free exercise clause.

While the regulations, on their face, conform to the constitutional requirements of minimal procedural due process, *Procunier v. Martinez, supra,* the practice of the defendants in restricting First Amendment freedoms under the guise of these facially valid rules has resulted in repeated violations of inmates' substantive rights.

---

**16.** The publications at issue here were periodicals written for and by prisoners and ex-prisoners, such as "The Penal Digest International." The printed motto of the magazine, printed on the cover of each volume, was "Our life's mission is to be impatient—to push social progress a little faster than it is prepared to go." *Id.* at 760.

Based on the above analysis, the Court undertakes the following two-part inquiry in ascertaining the validity of the plaintiffs' constitutional claims herein:

1.) Is the absolute prohibition of the Hebrew Israelite publications, in their unredacted form, the least restrictive means of protecting the state's interest in security and order within the prisons?

2.) Has the state demonstrated, by objective evidence, that the publications and religious practices prohibited by the Department of Corrections are substantially detrimental to those interests?

13. As to the first inquiry, the defendants have not attempted to propose any less restrictive means than their prior outright ban of the literature and of various incidents of Hebrew Israelite worship. Such a posture may be based in their contention, maintained throughout this litigation, that the *Bradbury/Shabazz* "less restrictive means" test is not applicable to this cause. Defendant Counselman, however, in his September 16, 1985 letter to Moses Israel (Yahweh ben Yahweh), did propose to admit the contested publications, on condition that they be substantially abridged so as to remove any text or illustration considered objectionable to himself, as spokesman for the Department of Corrections.

It is not the role of the state's administrative officials, nor of this Court, to engage in a process of selective censorship of constitutionally protected publications. The Court turns for guidance on this question of censorship, as a potential less restrictive alternative to outright prohibition of objectionable books and periodicals, to the well-developed jurisprudence governing permissible state regulation of allegedly obscene publications. In the seminal case of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court set out its well-known three-part test which, in essence, requires a reviewing court to evaluate each publication "taken as a whole."

In the case of books and periodicals, the *Miller* standard means that a reviewing court may not single out discrete portions or separate articles of a publication but must consider each publication in its entirety. *Penthouse International, Ltd. v. McAuliffe,* 610 F.2d 1353, 1367 (5th Cir. 1980) (and cases cited therein).

Since selective censorship of the Hebrew Israelite texts is not permissible, and since the state has proposed no workable less restrictive method to ensure security and order should the publications be admitted to the prisons, the Court concludes that the prison chaplains' refusals to allow members of the plaintiff class to receive those publications (and to enjoy all other religious privileges accorded to recognized faiths within the prison system) violates the plaintiffs' right to free exercise of the religious faith of their choice as guaranteed by the First and Fourteenth amendments.[17]

The Court's ruling here is equally grounded on its finding of fact, and as a matter of law, that the defendants have completely failed to show, by any objective evidence, that the introduction of the Hebrew Israelite literature and/or the allowance to Hebrew Israelite inmates of the full range of worship opportunities enjoyed by members of other faiths would "encourage or advocate riot, insurrection, escape, disruption, violence or violation of [applicable] rules" or would present any "clear and substantial threat" to prison security. *See Fla.Admin.Code* 33–3.12(6)(c) and (e), and paragraphs 8 and 9 of these Conclusions of Law, *supra.*

14. Count II of the plaintiffs' Amended Complaint seeks declaratory and injunctive relief on the ground that the Department of Corrections regulations governing re-

---

**17.** The instant ruling in no way restricts the defendants' power to take appropriate disciplinary measures, in accordance with established prison procedures, in cases where an inmate's abuse of his or her religious rights presents a real threat to the security and order of the institution. Such a "less restrictive means" of maintaining order was successfully applied to inmate Eugene Wade without intruding upon the religious freedoms of peaceful prisoners.

ceipt of religious reading material and opportunities for worship are unconstitutionally vague in that they fail to provide inmates with adequate notice of the nature of rejected material and do not inform them of the availability of alternative grievance procedures available through the chaplaincy services office. Furthermore, plaintiffs allege that the defendants' failure to follow their own existing regulations and procedural guidelines deprives the plaintiff class of due process and equal protection of the law.

■ The Court concludes that, in light of the foregoing ruling, it need not reach the issue of the alleged denial of equal protection and procedural due process rights caused by the defendants' application of the challenged regulations. These regulations, on their face, satisfy the minimal due process requirements for claims involving censorship of prisoner mail established in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). There the Court ruled that:

> An inmate [should] be notified of the rejection of a letter written by or addressed by him ... The author of that letter [should] be given a reasonable opportunity to protest that decision, and ... complaints [should] be referred to a prison official other than the person who originally disapproved the correspondence.

*Id.* at 418–19, 94 S.Ct. at 1814.

The Admissible Reading Rule, *Fla.Admin.Code* 33–3.12, provides, on its face, that written notice be given to each inmate addressee whose books are returned, describing the publication and the rule under which it is returned. It further provides for review, within fourteen days, by the Chaplaincy Services Coordinator (a person other than the initial decision maker.) Thus, the minimal procedural safeguards of *Martinez* are ostensibly provided by existing regulations.

Plaintiffs further assert, and defendants admit, that the existing regulations have not been uniformly implemented by officials at the various state prisons. There-

fore, the defendants will be held to their representation, at trial and in their post-trial memorandum, that the Hebrew Israelite faith shall henceforth be recognized by the Florida Department of Corrections as a *bona fide* religion and that its members be afforded the same opportunities to worship and utilize the chaplaincy services as are available to other religious inmates. The defendants shall further be required to apply all applicable regulations in an even-handed manner to Hebrew Israelite members incarcerated in all institutions under the authority and control of the Department of Corrections.

15. By reason of the aforegoing, the Court makes the following declarations and determination of rights.

The previous practices of the defendants in denying to members of the plaintiff class their rights to freely exercise their religious beliefs during their incarceration in institutions of the Florida Department of Corrections, as fully set out hereinabove, and the defendants' failure to apply a standard policy protective of plaintiffs' religious freedoms, are hereby DECLARED to have violated, and to continue to violate, the plaintiffs' rights under the First Amendment to the Constitution. It is thereupon

ORDERED and ADJUDGED that the defendants in this case be, and the same are ENJOINED from denying to the plaintiff class members their right to freely exercise the Hebrew Israelite faith while incarcerated in any of the Florida Department of Corrections Institutions in accordance with the Court's instant Order. Specifically, the defendants are hereby ORDERED as follows:

(1.) the Hebrew Israelite shall be recognized as a *bona fide* religion by the Florida Department of Corrections and by the 44 individual chaplains employed by the Department of Corrections, who shall afford the Hebrew Israelite inmates the same rights and privileges regarding religious activities that are enjoyed by inmates of other faiths.

(2.) to admit into each state penal institution, where an inmate has received, either solicited or unsolicited, by mail or by personal delivery, a copy or copies of any or all of the publications previously identified as Plaintiffs' Exhibits 4, 5, 6, 7, 7A, 8, 9 and 10, subject to reasonable inspection of such books for contraband or weapons.

(3.) to permit the study of the Hebrew Israelite faith, and the use of chapel facilities for the purpose of such study or prayer by individual inmates or by groups of inmates, provided that no inmate assumes a supervisory or leadership role in such prayer and study sessions in violation of applicable regulations prohibiting inmates from assuming authority over other inmates.

(4.) to permit each professing Hebrew Israelite inmate who so desires to wear on his person a religious medallion such as the "Star of David" provided such medallion is legally obtained by the inmate and that it is neither so sharp-edged as to constitute a weapon nor made from contraband material.

(5.) to afford all requesting inmate members of the class a pork-free diet upon request.

(6.) to allow all requesting inmate members of the class the opportunity to wear religious headdresses during formal worship services arranged through the prison chaplain and conducted by Temple elders or other authorized leaders.

(7.) to require individual prison chaplains to undertake reasonable efforts to contact members of the Temple of Love nearest to each prison and to encourage elders of the Hebrew Israelite faith to visit the prisons to hold worship services and pastoral visits.

While some of the aforegoing have been adopted as policy by the defendants, implementation of such policy shall henceforth be carried out uniformly through the Department of Corrections. It is further

ORDERED and ADJUDGED that the plaintiffs be awarded the costs of this litigation, pursuant to a bill of costs to be filed with the Court within THIRTY (30) DAYS HEREFROM. Costs shall be taxed by the Clerk of the Court.

The plaintiffs may file an application for attorneys' fees, under 42 U.S.C. § 1988, together with affidavits. If this method of application is not satisfactory to the parties, the Court will hold a hearing on the issue of attorneys' fees. The parties are encouraged to confer in an attempt to agree on an amount representing reasonable attorneys' fees, without a concession by defendants that attorneys fees are allowable unless or until appellate rights are exhausted as to that matter.

16. Final Judgment, consistent with this decision, shall be separately entered.