United States Court of Appeals,

Eleventh Circuit.

No. 94-4663.

Robert Lee LAWSON, on behalf of himself and all others similarly
situated, Plaintiffs-Appellees,

v.

Harry K. SINGLETARY, Secretary, Florida Department of
Corrections;  S.W. Sprouse, Superintendent, Hendry Correctional
Institution;  William E. Counselman, Educational Supervisor;
Stephen Spencer, Chaplain, Hendry Correctional Institution;  and
Paul Coburn, Assistant Superintendent, Hendry Correctional
Institution, Defendants-Appellants.

May 29, 1996.

Appeal from the United States District Court for the Southern
District of Florida. (No. 83-8409-CIV-ARONOVITZ), Sidney M.
Aronovitz, Judge.

Before ANDERSON and BARKETT, Circuit Judges, and YOUNG[*], Senior
District Judge.

PER CURIAM:

This case began as a pro se complaint by plaintiff-appellee

Robert Lawson, filed in 1983.  Counsel was appointed, and a class

certified.  The plaintiff class represented by Lawson (hereinafter

"Hebrew Israelites" or "plaintiffs") is made up of members of the

Hebrew Israelite faith currently serving time in the Florida prison

system.  The basis for their original complaint was that officials

of the defendant-appellant, the Florida Department of Corrections

(hereinafter "the Department"), refused to allow certain religious

texts, published by the Hebrew Israelites at their headquarters,

the "Temple of Love," into the prisons so that Hebrew Israelite

inmates could have access to them.  The plaintiffs seek injunctive

[*]Honorable George C. Young, Senior U.S. District Judge for
the Middle District of Florida, sitting by designation.

relief. The Department claimed that the Hebrew Israelite texts at issue contain "highly-charged, anti-white, racism" and thus presented a serious threat to security and order within Florida's prisons.

Soon after this litigation began, the Department, through head chaplain Counselman, attempted to create an informal redaction policy similar to the law now in place that would allow prison chaplains to remove the most objectionable portions of incoming religious materials. *See Lawson v. Wainwright,* 641 F.Supp. 312, 320-321 (S.D.Fla.1986). The materials at issue in this case were returned by Counselman to Yahweh ben Yahweh, the leader of the Hebrew Israelites, and ben Yahweh was asked to remove those statements that the Department thought were a threat to prison order and security. Once these sections were removed, Counselman assured ben Yahweh, the materials would be allowed into the prisons. *Id.* at 321. This original redaction policy, however, was poorly defined and sporadically enforced, and at times entire documents were excluded when only portions of those documents presented a threat to prison order and security. *Id.* at 317-319.

This case has a tortured procedural history. In 1986, the district court held that the Department's outright ban of these religious texts violated the plaintiffs' Free Exercise rights under the First Amendment. *Lawson v. Wainwright,* 641 F.Supp. 312 (S.D.Fla.1986) (hereinafter *Lawson I* ). The primary concern in the first appeal to this Court was the determination of the proper standard by which to evaluate the plaintiffs' Free Exercise claims. *Lawson v. Dugger,* 840 F.2d 779 (11th Cir.1988) (hereinafter *Lawson*

*II* ).  Following this Court's 1987 decision, the Supreme Court rendered its decision in *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), in which the Court reiterated the principle that prisoner constitutional rights claims are to be evaluated under the rational basis standard.  The Department's petition for certiorari in this case was granted, and the 1987 opinion of this Court was vacated and the case remanded for further consideration in light of *Thornburgh.*  *Dugger v. Lawson,* 490 U.S. 1078, 109 S.Ct. 2096, 104 L.Ed.2d 658 (1989) (hereinafter "*Lawson III*").  This Court in turn remanded to the district court. *Lawson v. Dugger,* No. 86-5774, 897 F.2d 536 (11th Cir. Feb. 1, 1990). Again, however, a change in the law affected the relevant standard. A few days before the district court held its status hearing on remand, Congress passed the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (hereinafter "RFRA"), which purports to reestablish through statute the compelling interest test for neutral laws that incidentally but substantially burden the free exercise of religion.[1]  Upon review, the district court interpreted the relevant official activity in this case to be an outright ban on certain incoming religious materials.  Then, applying the "least restrictive means" prong of the new RFRA test to the outright ban, the district court held that the Department's activity violated RFRA.  *Lawson v. Dugger,* 844 F.Supp. 1538, 1542 (S.D.Fla.1994) (hereinafter "*Lawson IV*").

Our primary task is to flesh out the meaning of the new RFRA standard as it applies in the prison context, and in particular as

---

[1]RFRA was signed into law on November 16, 1993.

it applies to this case.[2]  Two interrelated preliminary matters

[2]However, because we conclude that Rule 33-3.012 on its face passes even the most restrictive compelling interest test that Congress may have contemplated in drafting RFRA, we need not and do not today resolve the question of RFRA's constitutionality. *See* Jay S. Bybee, *Taking Liberties with the First Amendment: Congress, Section 5, and the Religious Freedom Restoration Act,* 48 VAND.L.REV. 1539 (1995) (questioning whether RFRA is an unconstitutional application of federal power to the states not authorized by § 5 of the Fourteenth Amendment);  Christopher L. Eisgruber & Lawrence G. Sager, *Why the Religious Freedom Restoration Act is Unconstitutional,* 69 N.Y.U.L.REV. 437 (1994) (questioning whether RFRA violates the separation of powers doctrine, the Establishment Clause, and § 5 of the Fourteenth Amendment, and noting that, "RFRA not only defies [*Employment Div., Dept. of Human Res. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ], it misreads the Supreme Court's jurisprudence prior to *Smith;*  and RFRA not only gives religious believers far more than their constitutional due, it does so in a fashion that is itself constitutionally objectionable precisely in terms of religious freedom.");  Scott C. Idleman, *The Religious Freedom Restoration Act:  Pushing the Limits of Legislative Power,* 73 TEX.L.REV. 247 (1994) (suggesting that RFRA may violate the Establishment Clause of the First Amendment to the Constitution, in part because it expands the bounds of Free Exercise beyond the point which the Court has in the past taken it, by establishing a preference for religiosity over non-religiosity);  *see also Everson v. Board of Ed. of Ewing Twp.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) ("The "establishment of religion' clause of the First Amendment means at least this:  Neither a state nor the Federal Government can set up a church.  Neither can pass laws which aid one religion, *aid all religions,* or prefer one religion over another ...") (emphasis added);  *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961) ("We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief of any religion. *Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers ...*") (internal quotation omitted) (emphasis added);  *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (statute must have secular legislative purpose, and must primarily neither advance nor inhibit religion, nor foster excessive government-religion entanglement, to avoid reach of Establishment Clause);  *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (same);  *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (invalidating, on Establishment grounds, Texas law granting sales tax exemption to religious publications);  *Board of Ed. of Kiryas Joel v. Grumet,* --- U.S. ----, ----, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) ("A proper respect for both the Free Exercise and the Establishment Clauses compels the State

require discussion: Florida's new Rule 33-3.012 [3] governing the admissibility into Florida prisons of publications, including religious materials; and the propriety of our consideration in this appeal of the Rule's redaction policy.

## I. RULE 33-3.012 AND REDACTION

In addition to the passage of RFRA, another significant change in the complexion of this case occurred after remand to the district court. On December 17, 1991, Florida amended Rule 33-3.012, *inter alia,* to incorporate a formal and more precise redaction policy. The portions of the Rule relevant to this case are as follows:

> (4) Inmates shall be permitted to receive publications except when the publication is found to be detrimental to the security, order or disciplinary or rehabilitative interests of the institution or when it is determined that the publication might facilitate criminal activity. Publications shall be rejected when one of the following criteria are met:

---

to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents.") (internal citations omitted). The Fifth Circuit in *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996), rejected an argument that RFRA on its face violates the Establishment Clause, noting that the statute expressly limits its application such that the Establishment Clause shall not be affected. *See* 42 U.S.C. § 2000bb-4, *cited in Flores,* 73 F.3d at 1364; *but see Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2838, 106 L.Ed.2d 93 (1989) ("To the extent that the federal parties suggest that we should defer to Congress' conclusion about an issue of constitutional law, our answer is that while we do not ignore it, it is our task in the end to decide whether Congress has violated the Constitution. This is particularly true where the Legislature has concluded that its product does not violate the First Amendment."). Because we conclude that Rule 33-3.012 on its face passes the RFRA test, we need not address whether RFRA violates the Establishment Clause. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

[3]FLA.ADMIN.CODE ANN. § 33-3.012 (1995).

. . . . .

(e) It depicts, describes or encourages activities which may lead to the use of physical violence or group disruption;

. . . . .

(h) It otherwise presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person. If only a portion of a publication meets one of the above criteria for rejection, the entire publication shall be rejected unless the reading material is of a religious nature. *In the case of religious material, the inmate shall be advised that he may receive the materials only after the inadmissible portion is removed.* The inmate shall make the decision whether to return the material to the sender or to receive the admissible portions after the institution has excised the inadmissible material, and the inmate may appeal the institution's determination that the material must be excised or returned. The institution shall not take any action to excise or return inadmissible reading material until the inmate's appeal is concluded or the time for appeal has passed.

FLA.ADMIN.CODE § 33-3.012(4) (1995) (emphasis added).[4] Appeals from decisions to redact certain sections from religious materials are heard by a literature review committee made up of the Assistant Secretary of Operations, one superintendent, one security administrator, the library services administrator and one institutional librarian. FLA.ADMIN.CODE § 33-3.012(2).

The plaintiffs contend that the Department did not specifically argue redaction in its briefs to the district court at the original trial nor on remand, and did not do so until the Department's motion for rehearing. The plaintiffs argue accordingly that the Department has waived the issue. The district court agreed with the plaintiffs and denied the Department's motion

---

[4]Rule 33-3.012 is similar in some respects to federal prison regulations governing the admissibility of reading materials. *See* 28 C.F.R. § 540.71. However, the Federal regulations do not have a special exception for religious materials permitting redaction as opposed to total exclusion.

for rehearing. The district court declined to consider redaction, relying instead on the procedures in use by the Department when this litigation began in 1983, which the district court construed to be an outright ban on the religious materials introduced at trial.

This Court interprets the Department's motion for rehearing on the redaction issue as a Fed.R.Civ.P. 59(e) motion. *McGregor v. Bd. of Com'rs of Palm Beach County,* 956 F.2d 1017, 1020 (11th Cir.1992). We review the district court's denial of the Department's motion for rehearing for abuse of discretion. *O'Neal v. Kennamer,* 958 F.2d 1044, 1047 (11th Cir.1992); *American Home Assur. Co. v. Glen Estess & Assoc., Inc.,* 763 F.2d 1237, 1238-39 (11th Cir.1985). In *American Home,* we affirmed a district court's denial of a Rule 59(e) motion that raised for the first time a choice of law issue. *American Home,* 763 F.2d at 1239. We noted that, "[t]he decision to alter or amend judgment is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion." *Id.* at 1238-39.

Several reasons persuade us that the district court abused its discretion by failing to consider redaction, which stands at the core of the current Florida regulation. In our judgment, it would be impossible to evaluate the facial constitutionality of Rule 33-3.012, and its compatibility with RFRA, without considering redaction, which is the essence of the Rule's policy toward religious publications. This case involves only injunctive relief. Therefore, the only viable issues are the facial validity of Rule

33-3.012, and its validity as applied. [5]   Because these issues cannot be intelligently assessed without considering redaction, justice requires that we do so.

Finally, a federal court order dictating the security-related activities of state prison officials raises serious comity concerns.  The maintenance of prison security, which is central to this case, is a matter of immense importance to the State of Florida and, of course, responsibility for prison security is committed to the State.  Even if the Department's deficiencies in the presentation of this issue to the district court might lead us to impose waiver in some other context, interests of comity combine with the foregoing factors to persuade us otherwise in this case.[6] Assuming, as we hold below, that Florida's Rule 33-3.012, with its redaction policy, is facially valid, it would constitute manifest injustice to enjoin state prison officials from the exercise of their duties to maintain prison security based on the technicality that their attorneys failed to present an issue to the district court with sufficient clarity.  We conclude that the district court

---

[5]Plaintiffs' efforts in this litigation have focussed only on obtaining injunctive relief, either because that is their only real interest or because of the likelihood that qualified immunity will bar any claim for damages.  Injunctive relief is, of course, prospective, and thus only Rule 33-3.012 is at issue. The validity of the Department's application of its prior policy, with its informal, imprecise and sporadically enforced redaction policy, is moot.

[6]We can discern no prejudice to the plaintiffs as a result of our consideration of the Department's current redaction policy embodied in Rule 33-3.012, because they have had a full opportunity in brief and oral argument to discuss the effect of redaction on the facial validity of the Rule.

abused its discretion in failing to consider the redaction issue.[7]

## II. THE RELIGIOUS FREEDOM RESTORATION ACT ("RFRA")

Having established that the issue in this case is the redaction policy found in Rule 33-3.012, we turn to our primary task of evaluating the validity of the Rule in light of RFRA. To understand how RFRA's compelling interest standard should be applied in the prison context, it is necessary to understand both the legal landscape at the time it was enacted and congressional intent as evidenced by the statute itself and its legislative history. We first address congressional intent and the case law to which Congress intended courts to look for guidance.

A. *Congressional Intent and the Case Law Background*

The stated purpose of RFRA is to restore the broad applicability of the compelling interest test established in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1960), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), which was substantially circumscribed by

---

[7]We recognize that the district court in *Lawson I* summarily rejected the Department's reliance on its previous, informal redaction policy. *Lawson I,* 641 F.Supp. at 329. The district court relied on the requirement set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), that allegedly obscene publications be evaluated as a whole. It was error to rely on *Miller,* a case involving the First Amendment rights of non-incarcerated persons. By contrast, prison inmates retain only such First Amendment rights as are not inconsistent with their status as prisoners. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). There is clearly no *per se* bar to censorship of incoming prisoners' mail. *See Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safely,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Abbott v. Meese,* 824 F.2d 1166 (D.C.Cir.1987), *vacated by Thornburgh v. Abbott,* 490 U.S. 401, 407-408, 109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459 (1989); *McCorkle v. Johnson,* 881 F.2d 993 (11th Cir.1989).

*Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).  The Act states:

(b) *Purposes*

The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened ...

42 U.S.C. § 2000bb(b).

(b) *Exception*

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest;  and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(b).  Congress was obviously attempting to create a statutory buffer around a more limited constitutional right.  *Cf. Katzenbach v. Morgan,* 384 U.S. 641, 653-54, 86 S.Ct. 1717, 1724-25, 16 L.Ed.2d 828 (1966) (implying that Congress has the power to create rights not recognized by the Supreme Court). That intent was manifest in the statutory language restoring the compelling interest test.

The text of RFRA, however, does not elaborate on how the compelling interest test is to be applied.  Nowhere in the statute does Congress state that the test is to be construed in precisely the same manner in varying factual scenarios and contexts.  By referring to the "compelling interest test," Congress obviously intended for courts to look for guidance to those cases employing

that term.  *Astoria Fed. S & L Ass'n v. Solimino,* 501 U.S. 104, 108, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991) (Congress legislates against the background of federal common law principles).

The Supreme Court has historically applied the compelling interest standard somewhat differently depending on the context in which the protected right arose.  *Procunier v. Martinez,* 416 U.S. 396, 409-410, 94 S.Ct. 1800, 1809-1810, 40 L.Ed.2d 224 (1974) ("First Amendment guarantees must be "applied in light of the special characteristics of the ... environment.' ") (quoting *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969)).  This is notably true in the prison context.  Indeed, the legislative history of RFRA expressly assumes that courts will apply RFRA in the prison context within the framework of prior case law.  Both congressional committees charged with consideration of the legislation clearly intended the courts to continue to afford deference to the judgment of prison officials.

> The intent of the act is to restore [the] traditional protection afforded to prisoners' claims prior to *O'Lone,* not to impose a more rigorous standard than the one that was applied....  Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources....  At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

S. REP. NO. 111, 103d Cong., 1st Sess. 10 U.S.Code Cong. & Admin.News 1993 pp. 1892, 1899.

> Therefore, the compelling governmental interest test should be applied to all cases where the exercise of religion is substantially burdened; however, the test should not be construed more stringently or more leniently than it was prior to *Smith* ....  Prior to 1987, courts evaluated free exercise challenges by prisoners under the compelling governmental interest test.  The courts considered the religiously inspired exercise, as well as the difficulty of the prison officials' task of maintaining order and protecting the safety of prison employees, visitors and inmates.  Strict scrutiny of prison regulations did not automatically assure prisoners of success in court.

H.R.REP. NO. 88, 103d Cong., 1st Sess. 8;  *see also* 139 CONG.REC. § 14362-14365 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch).

On June 9, 1987, the Supreme Court in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), articulated an unadorned rational basis test for the evaluation of prison regulations challenged under the Free Exercise Clause. RFRA's legislative history contains some evidence that Congress may have intended to restore the standard for the protection of prisoner Free Exercise rights to where it stood prior to the Court's decision in *O'Lone.*  However, even prior to *O'Lone,* the Supreme Court and the lower federal courts applied the compelling interest test in the context of prisoners' Free Exercise or Free Speech claims by recognizing the special circumstances of the prison context, including recognition of the state's substantial interest in prison security and order and of the substantial deference due the judgment of prison officials with respect thereto.  The primary reason for this is the more limited nature of the First Amendment rights enjoyed by prisoners after incarceration.  In *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), for example, the Court noted that "[i]n the First Amendment context ... a prison inmate retains

those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Accord Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2535, 53 L.Ed.2d 629 (1977). *See also Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948); *Bradbury v. Wainwright,* 718 F.2d 1538, 1540-41 (11th Cir.1983).

In cases involving constitutional challenges to prison regulations, including those implicating the free exercise of religion, the Supreme Court has long made clear that Federal courts must afford substantial deference to the judgment of prison authorities.[8] *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).[9] In evaluating prisoners' constitutional rights claims

---

[8]The cases discussed in the text involve First Amendment rights, including both Free Exercise and Free Speech. In the prison context, the Supreme Court and the lower federal courts have held that the same deference is due the judgment of prison officials with respect to security and other penological concerns, whether the case involves Free Speech or Free Exercise rights. "In the absence of a contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott International, Inc. v. Wylander,* 498 U.S. 337, 342, 111 S.Ct. 807, 811, 112 L.Ed.2d 866 (1991).

[9]All of the cases cited were decided before *O'Lone.*

that challenge assertions by prison officials that the inmates' rights must yield before the state's legitimate penological interests, courts have "accorded wide-ranging deference [to prison administrators] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878; *accord Jones,* 433 U.S. at 128, 97 S.Ct. at 2539; *Martinez,* 416 U.S. at 404-05, 94 S.Ct. at 1807; *Cruz,* 405 U.S. at 321, 92 S.Ct. at 1081. Such deference is especially appropriate with respect to the primary state interest involved in this case—the maintenance of peace and security within the prison facility. *Pell,* 417 U.S. at 823, 94 S.Ct. at 2804 ("Central to all other corrections goals is the institutional consideration of the internal security within the corrections facilities."). The justifications for this deference include the complexity of prison management, the fact that responsibility therefor is necessarily vested in prison officials, and the fact that courts are ill-equipped to deal with such problems. *Martinez,* 416 U.S. at 404-05, 94 S.Ct. at 1807.

The standard for evaluating prisoner constitutional rights claims was initially articulated by the Supreme Court in 1974 in *Martinez.*

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.... Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811. The two prongs of the *Martinez* standard correspond to the two prongs of the compelling

interest test as it has been articulated by the Court in other contexts: infringement on such constitutional rights is justified only by a compelling state interest and only when the regulation at issue is the least restrictive means for satisfying that interest. Because the first prong is unquestionably satisfied in this case, and indeed is conceded by the plaintiffs, we focus on the second prong.

The Court's holding in *Martinez* teaches that the compelling interest test is to be employed by recognizing the special circumstances of the prison context, including recognition of the state's substantial interest in prison security and order and of the substantial deference due the judgment of prison officials with respect thereto. *Martinez,* 416 U.S. at 404-05, 94 S.Ct. at 1807. The Court noted that although it was applying the compelling interest test,

> This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty.

*Id.* at 414, 94 S.Ct. at 1812.[10] Similarly, in *Bell v. Wolfish,* the Court reemphasized the "wide-ranging deference" to be accorded the judgment of prison officials.

> Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that

---

[10]We are aware that the result in *Martinez* has subsequently been limited by *Thornburgh v. Abbott,* 490 U.S. 401, 407-408, 109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459 (1989). However, in order to elaborate on what Congress meant by using the term "least restrictive means," we must determine its meaning in the prison context, as construed by the courts.

the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Bell,* 441 U.S. at 547-48, 99 S.Ct. at 1879 (quoting *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806).

We recognize that, following the *Martinez* decision, the constitutional standard employed by the Supreme Court continued to evolve in the direction of a rational basis standard.[11]  We also

---

[11]Both prongs of the *Martinez* standard have evolved in the direction of a simple rational basis standard.  In *Turner,* the Supreme Court discussed in detail four cases which followed *Martinez: Pell* (1974), *Jones* (1977), *Bell* (1979), and *Block* (1984).  The Court noted that "[i]n none of these four prisoners' rights cases did the Court apply a standard of heightened scrutiny, but instead inquired whether a prison regulation that burdens fundamental rights is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns."  *Turner,* 482 U.S. at 87, 107 S.Ct. at 2260 (internal quotations omitted).  The Court then concluded:

> If *Pell, Jones,* and *Bell* have not already resolved the question posed in *Martinez,* we resolve it now:  when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.

*Id.* at 89, 107 S.Ct. at 2261.  It is clear that the *Turner* Court contemplated that both prongs of the *Martinez* standard had so evolved.  In discussing the "ready alternatives" factor, through which courts determine if there are available alternatives to the prison policy at issue that satisfy the legitimate interests of the prison administration, the Court asserted that the existence of such alternatives may be evidence that the policy is an "exaggerated response" rather than a reasonable regulation.  But the Court was careful to note that,

> This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimants' constitutional complaint.  But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* costs to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

recognize that it is far from clear which precise point in this evolution Congress intended to select as the appropriate analysis for the application of RFRA in a prison context. We need not in this case decide this precise point, because we can assume *arguendo* that the appropriate standard is the one set forth in *Martinez,* which articulates the appropriate standard in the formulation most favorable to the plaintiffs, as compared to the formulation found in the cases that followed *Martinez.* Applying that standard, tempered by the deference due prison officials that *Martinez* commands, we readily conclude that Rule 33-3.012 passes muster under RFRA, as discussed more fully below. Accordingly, we need not and do not in this case decide if Congress intended a somewhat less demanding standard like the one that evolved in the cases that follow *Martinez* and predate *O'Lone.*

B. *Facial Validity of Rule 33-3.012 Under RFRA*

Because RFRA provides statutory protection for religious practice that is broader than the core constitutional right explicated in *O'Lone,* and because *Martinez* represents the zenith of judicial scrutiny of prison regulations under the light of prisoner

---

*Id.* at 90-91, 107 S.Ct. at 2262 (citations omitted). *But see* H.R.Rep. No. 88, 103d Cong., 1st Sess. 7-8 ("Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners ... under the compelling governmental interest test ... [O]fficials must show that the relevant regulations are the least restrictive means of protecting a compelling governmental interest.").

As noted in the text, resolution of this case does not require that we determine the extent to which the *Martinez* standard has evolved into a rational basis analysis. It is sufficient for the resolution of this case to apply the *Martinez* standard as written, moderated by the wide-ranging deference due the judgment of prison authorities which that opinion contemplated.

constitutional claims, we analyze Rule 33-3.012 utilizing the *Martinez* standard articulated above.[12] Whether the Rule comports with RFRA is a pure question of law, and is subject to *de novo* review by this Court. *See Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1190 (11th Cir.1995).

It is well established that states have a compelling interest in security and order within their prisons. *Harris v. Forsyth,* 735 F.2d 1235 (11th Cir.1984); *Sullivan v. Ford,* 609 F.2d 197 (5th Cir.), *cert. denied,* 446 U.S. 469, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980). In the case at bar, the Hebrew Israelites concede that Florida has a compelling interest in prison security. At issue are the means chosen by the state of Florida to satisfy this interest, which necessarily implicates RFRA's least restrictive means prong. As explained above, we conclude that Congress intended this second RFRA prong to be no more vigorous than its corresponding incarnation in *Martinez.* Thus, Rule 33-3.012's "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811. In the application of this standard, we must accord wide-ranging deference to the judgment of the Department. Moreover, the "prison

---

[12]Because we find that Rule 33-3.012 passes muster under *Martinez*—which represents both the statutory standard under RFRA in the most favorable formulation for which the plaintiffs could reasonably hope and the historical summit of the Court's review of prisoner constitutional claims—we conclude *a fortiori* that the Rule is constitutional on its face. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404-05, 96 L.Ed.2d 282 (1987) (holding that a prison regulation that impinges upon inmates' Free Exercise rights is constitutionally valid if it is reasonably related to legitimate penological interests).

administrators ... [are not] required to show with certainty that adverse consequences would flow from the failure to censor" a particular publication.  *Id.* at 414, 94 S.Ct. at 1811-12.

Applying the foregoing standard to Rule 33-3.012, we readily conclude that the Rule satisfies RFRA's least restrictive means test.  Indeed, it is hard to imagine a means more specifically or more narrowly addressed to the problem posed by passages of text which the Department has determined may lead to violence or disruption, or which otherwise pose a threat to security.  *Abbott v. Meese,* 824 F.2d at 1172-1173.  The Rule is explicitly addressed to the penological interest at stake, namely security.  It is not vague or overbroad and it does not give unbridled discretion to prison administrators.[13]  *See Vodicka v. Phelps,* 624 F.2d 569, 570-571 (5th Cir.1980) (finding facially valid under *Martinez* a prison regulation allowing the withholding of prisoner mail that presents an "immediate threat" to security);  *see also Abbott v. Meese,* 824 F.2d 1166, 1172-1173 (D.C.Cir.1987), *vacated by Thornburgh v. Abbott,* 490 U.S. 401, 407-408, 109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459 (1989) ("If a regulation were to authorize the Warden to reject a portion of a publication only if he found that the material would "encourage' violence, or some other specified type of conduct breaching security or order ... we think that regulation could survive the minimum *Martinez* tests.");  *Gaines v. Lane,* 790 F.2d 1299 (7th Cir.1986) (finding prison regulation, which only

---

[13]Under Rule 33-3.012, inmates have a right to appeal decisions to redact certain sections from religious texts, and these appeals are heard by a literature review committee.  The plaintiffs do not challenge the district court's ruling that the Rule does not violate the plaintiffs' due process rights.

allows prison officials to censor mail which presents a threat to prison security, sufficiently narrowly-tailored to be facially valid under *Martinez* ); *George v. Sullivan,* 896 F.Supp. 895 (W.D.Wis.1995) (upholding prison regulation permitting banning of white supremacist religious literature, even in light of RFRA's heightened standard of review).

The plaintiffs argue, relying on the law of the case doctrine, that this Court's decision in this matter is dictated by our prior decision in *Lawson II,* 840 F.2d 779 (11th Cir.1987). The law of the case doctrine does not apply in this instance for three reasons. First, this Court's opinion in *Lawson II* was vacated by the Supreme Court in *Dugger v. Lawson,* 490 U.S. 1078, 109 S.Ct. 2096, 104 L.Ed.2d 658 (1989), with instructions to reconsider in light of *Thornburgh v. Abbott,* 490 U.S. 401, 407-408, 109 S.Ct. 1874, 1878-1879, 104 L.Ed.2d 459 (1989). Accordingly, this Court is not bound by the vacated decision. *United States v. M.C.C. of Florida,* 967 F.2d 1559, 1561-1562 (11th Cir.1992). Second, the crux of the dispute in *Lawson II,* and indeed in the whole first round of this litigation, was a disagreement about the standard of review that should be applied to the Department's regulations. Thus, the focus of the briefs submitted to this Court in *Lawson II,* as well as the focus of our opinion, was not on the regulations themselves, but instead was on whether the trend in Supreme Court prisoner Free Exercise jurisprudence is one leading toward the application of a rational basis test. Finally, Florida has in the interim changed its prison regulations governing the admissibility of religious materials. As written, Rule 33-3.012 is substantially

different from its predecessor, which we considered in *Lawson II.* Not only has the law changed, but also the facts of the case have changed.[14]

C. *Rule 33-3.012 As Applied*

In this litigation, no court has been asked to determine which specific portions of any particular Hebrew Israelite publication can be redacted by the Department, operating under the authority of the new Rule 33-3.012, consistent with the Constitution and RFRA. Indeed, it appears that the Department may not have applied its new Rule because of this ongoing litigation. It may be that there is no "as applied" issue in this case. This is a question that will have to be determined on remand in the district court. As a practical matter, an "as applied" issue will not arise until a prisoner challenges a particular Department action. The Department will have to identify those sections of the Hebrew Israelite publications that it has decided must be removed pursuant to the Rule, and the district court will then have to determine if the Department can redact those specific portions without running afoul of the United States Constitution and RFRA.[15]

---

[14]As noted above, the validity of the Department's application of its previous policy to the religious texts introduced at trial is moot. The district court erred in focusing on that issue rather than the only viable issue in the case—the validity of Rule 33-3.012.

[15]Because an "as applied" challenge might be ripe and might be presented on remand, we provide some limited guidance to avoid repetition of clear error. In *Lawson I,* 641 F.Supp. at 329, the district court may have labored under the misconception that the Department was required to adduce specific evidence of a causal link between text that it wants to remove and actual incidents of violence (or some other actual threat to security). To the extent that the district court did in fact labor under any such belief, it erred. Requiring proof of such a correlation

## III. CONCLUSION

Pursuant to the above discussion, we hold that Rule 33-3.012 is facially valid under both the United States Constitution and RFRA.  We therefore reverse the decision of the district court, and remand to that court for an exploration of any "as applied" issues that may be ripe.

REVERSED and REMANDED.

---

constitutes insufficient deference to the judgment of the prison authorities with respect to security needs.  *See Procunier v. Martinez,* 416 U.S. at 414, 94 S.Ct. at 1812 (Prison authorities are not "required to show with certainty that adverse consequences would flow from the failure to censor a particular letter.  Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty.").